**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 28, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES ex rel. EDWARD J.
BURLBAW and DONALD D.
BUSTAMANTE,

      Plaintiffs - Appellants/Cross-
      Appellees,

v.

J. MICHAEL ORENDUFF, in his
individual capacity; WILLIAM
CONROY, in his individual capacity;
ROBERT E. WEIGLE, in his
individual capacity; LINDA
DAVIDSON, the Personal
Representative of the ESTATE OF
THOMAS DAVIDSON, in his
individual capacity; DONALD BIRX,
in his individual capacity; MIRIAM A.
GERBER MEYER, in her individual
capacity,

      Defendants - Appellees/Cross-
      Appellants.

---

UNITED STATES OF AMERICA,

      Amicus Curiae.

No. 05-2393
and
No. 06-2006

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:99-CV-01443-BB-RHS)**

Duff Westbrook of Sanders & Westbrook, P.C., Albuquerque, New Mexico, (Maureen A. Sanders, Sanders & Westbrook, P.C., and Joleen K. Youngers, Almanzar & Youngers, P.A., Las Cruces, New Mexico, with him on the briefs), for Plaintiffs-Appellants/Cross-Appellees.

Kenneth L. Harrigan, Modrall, Sperling Roehl Harris & Sisk, P.A., Albuquerque, New Mexico, (Stephen S. Hamilton and Andrew S. Montgomery, Montgomery & Andrews, P.A., Santa Fe, New Mexico; Alex C. Walker, Modrall, Sperling Roehl Harris & Sisk, P.A.; with him on the briefs), for Defendants-Appellees/Cross-Appellants.

Michael S. Raab, Appellate Staff, Civil Division, U.S. Department of Justice, Washington D.C., (Peter D. Keisler, Assistant Attorney General, and David C. Iglesias, United States Attorney, with him on the brief), for the United States of America as amicus curiae.

Before **TACHA**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Plaintiffs-Appellants Edward Burlbaw and Donald Bustamante ("relators") challenge the district court's grant of summary judgment on their claims under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. Relators alleged that defendants, past and present high-ranking administrators of New Mexico State University ("NMSU"), falsely certified that NMSU was a "minority institution" eligible for Department of Defense ("DoD") set-aside contract grants. After concluding that qualified immunity was a viable defense under the FCA, the district court granted summary judgment to defendants under the first prong of the

2

qualified immunity test.  *See United States ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276, 1289 (D.N.M. 2005).  The district court held that relators failed to put forward evidence from which a reasonable jury could find that defendants violated the FCA.

Defendants timely filed a cross-appeal, but expressly conditioned their request for relief on our resolution of relators' appeal.  Specifically, defendants have taken the position that if we affirm the district court's rulings against relators and in their favor, there is no need for us to resolve the issues presented in their appeal.[1]  They challenge the district court's decision to permit relators to amend their complaint to bring claims against defendants in their individual capacity. Defendants first argue that, pursuant to the logic of *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000), state officials are not "persons" within the meaning of § 3729(a) of the FCA.  Defendants further contend that the Eleventh Amendment bars these particular individual-capacity

---

[1]    In particular, defendants stated:

> If this Court agrees that Relators failed to produce evidence to support an essential element of their claim, then it need not consider the other issues raised on this appeal.  The determination that Relators cannot prove their case under the FCA renders [] moot the questions of whether qualified immunity is a recognized defense in an FCA action, whether Defendants were entitled to qualified immunity, and whether Defendants were subject to suit in their individual capacities in the first place.

Aplee. Br. at 22.

claims, since NMSU is the real party in interest.

We **AFFIRM** the district court's grant of summary judgment in favor of defendants on relators' FCA claims. Like the district court, we hold that relators failed to introduce sufficient evidence for a jury to find that any defendant knowingly misrepresented NMSU's eligibility as a minority institution. Our holding, however, is narrower than that of the district court. Because no reasonable jury could find an FCA violation, we need not decide whether qualified immunity functions as a defense. We also have no need to reach the scabrous issues presented in defendants' conditional cross-appeal, such as whether state officials are "persons" within the meaning of the FCA or whether the Eleventh Amendment bars the instant action against defendants in their individual capacity.

## I.    BACKGROUND

NMSU created a division called the Physical Sciences Laboratory ("PSL"). Between 1993 and 2003, NMSU, through the PSL, applied for and obtained grants and contracts from the DoD under its Historically Black Colleges and Universities/Minority Institutions ("HBCU/MI") contract set-aside program ("DoD set-aside program" or "set-aside program").

### A.    Statutory and Regulatory Framework

Since 1986, Congress has instructed the DoD to award 5% of certain small-business contracts to "historically Black colleges and universities" and "minority institutions," as the latter is defined in the Higher Education Act of 1965 ("HEA").

4

*See* National Defense Authorization Act for Fiscal Year 1987, Pub. L. No. 99-661, § 1207(a), 100 Stat. 3816, 3973 (1986) (originally appearing as 10 U.S.C. § 2301 note; repealed and recodified as amended at 10 U.S.C. § 2323 by the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 801(a), (h), 106 Stat. 2315, 2442-45 (1992)).  The standards of eligibility for the DoD set-aside program have changed several times since 1986.  Prior to 1993, "minority institutions" were eligible for set-aside contracts if they met various requirements prescribed by the Secretary of Education ("SOE") for the Strengthening Institutions Program under Title III of the HEA.  *See* 10 U.S.C. § 2301 note (1988).  Under the pre-1993 standards, an educational institution qualified as a "minority institution" if it met the definition of "eligible institution" under 20 U.S.C. § 1058(b)(3)-(5), which covered institutions that, *inter alia*, retained a 20% enrollment of Mexican American, Puerto Rican, Cuban, or other Hispanic students, or some combination thereof.  *Id.*  In practice, the Department of Education ("DoE") provided the DoD with lists of Title III-qualifying institutions with a breakdown of minority enrollment data.

In November 1993, Congress strengthened the criteria for minority-institution eligibility for the DoD set-aside program.  *See* National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 811, 107 Stat. 1547, 1702 (1993) (codified at 10 U.S.C. § 2323(a)(1)(C) (1994)).  The amended statutory criteria redefined "minority institutions" according to 20 U.S.C. § 1135d-

5

5(3). 10 U.S.C. § 2323(a)(1)(C) (1994). It also grouped "Hispanic-serving institutions," as defined by 20 U.S.C. § 1059c(b)(1), under the heading of "minority institutions." *Id.*

Under this new criteria, an institution of higher education satisfied the definition of a "minority institution" if, *inter alia*, it possessed an enrollment of a single minority or a combination of minorities in excess of 50% of the total enrollment. 20 U.S.C. § 1135d-5(3) (1994). An institution was a "Hispanic-serving institution"—hence a "minority institution"—if, *inter alia*, (1) it possessed an undergraduate full-time enrollment of at least 25% Hispanic students; (2) not less than 50% of its Hispanic students were low-income individuals who were first-generation college students; and (3) another 25% of its Hispanic students were either low-income individuals or first-generation college students. *Id.* § 1059c(b)(1) (1994).

In October 1998, Congress broadened the eligibility requirements to qualify as a "Hispanic-serving institution." *See* Higher Education Amendments of 1998, Pub. L. No. 105-244, sec. 501, § 502(a)(5), 112 Stat. 1581, 1767 (1998) (originally codified at 20 U.S.C. § 1101a(a)(5)). Under the 1998 criteria, an institution qualified as a "Hispanic-serving institution" if, *inter alia*, its enrollment of undergraduate full-time equivalent students was at least 25% Hispanic and it provided assurances that not less than 50% of its Hispanic students were low-

6

income individuals. 20 U.S.C. § 1101a(a)(5) (2000).[2]

Between 1993 and 2000, the HEA required the SOE to verify minority-institution status from enrollment data furnished by the institution to the DoE. *See* 20 U.S.C. § 1135d-5(3) (1994) (recodified at 20 U.S.C. § 1067k(3) (2000)). The DoD's regulatory scheme during this time continued to rely on the SOE's verification of minority-institution status for DoD set-aside program eligibility. The DoD permitted applicants, prior to receiving an award under the set-aside program, to evidence their eligibility by showing that "the Secretary of Education has determined the offeror to be a historically black college or university or minority institution." 48 C.F.R. § 252.226-7000(c)(2).

B.      Factual History

1.      The DoD's Assurances of NMSU's Eligibility

Prior to December 1993, NMSU met the definition of a minority institution under the Strengthening Institutions Program of Title III. The DoE designated NMSU a minority institution under this pre-1993 criteria, thereby making NMSU eligible to apply for DoD set-aside contracts.

In March 1994, the DoD sent the DoE a request for a "list of schools that

---

[2]      In December 2001, Congress removed "Hispanic-serving institutions" from the definition of "minority institutions" under 10 U.S.C. § 2323(a)(1)(C). *See* National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 1048(a)(17)(C), 115 Stat. 1012, 1223 (2001). This amendment is not relevant to this litigation because, as the district court correctly observed, relators do not allege any violations of the FCA after May 2000.

meet the new minority institution criteria contained in Section 811 of P.L. 103-160, the FY 1994 DoD Authorization Act," including Hispanic-serving institutions. App. at 629. The DoE told the DoD that it publishes a list of "U.S. Accredited Post-secondary Minority Institutions" meeting this statutory criteria (i.e., 20 U.S.C. §§ 1135-5(3), 1059c(b)(1)). *Id.* at 717. The DoE further explained that this list was the product of a census conducted by the DoE's "Office of Civil Rights, in collaboration with the National Center for Educational Statistics, . . . of all universities biannually in even numbered years." *Id.* This list included NMSU.

On April 1, 1994, the DoD sent NMSU a memorandum attaching the DoE's list. The DoD memorandum stated that this list was effective immediately, and further authorized NMSU to distribute the list "to the appropriate contracting activities." App. at 629. It also stated that an "institution contending that they [sic] meet[s] the eligibility criteria but is not on the list, must contact the Office of Civil [R]ights with the Department of Education to obtain information on how to be included on the updated list." *Id.*

In fact, despite the various changes in eligibility criteria, NMSU regularly appeared on the DoE's lists of minority institutions during the time period relevant to this litigation (i.e., 1994-2000). For instance, in January 1996, the DoD sent NMSU a broad agency announcement of a set-aside grant for minority institutions. The announcement cited the statutory criteria for eligibility, including 10 U.S.C. § 2323(a)(1)(C), and then stated that "[t]he most recent lists of . . . certified minority

8

institutions which meet the above criteria are provided in Appendix A." App. at 886. NMSU appeared in Appendix A, on a list covering all "1995-1996 United States Department of Education U.S. Accredited Postsecondary Minority Institutions." App. at 888. The announcement acknowledged that the list was compiled by the DoE in accordance with 20 U.S.C. § 1135d-5(3), based upon data reported by the institutions through enrollment surveys. The announcement further stated that if an institution's name did not appear in Appendix A, its proposal for a set-aside would not be accepted.

In August 2000, the DoD solicited grant proposals from minority institutions, including NMSU. The solicitation confirmed that the DoE "maintains the list of U.S. accredited postsecondary institutions that currently meet the statutory criteria for identification as minority institutions." App. at 696. Shortly thereafter, NMSU received the DoE's updated list for the year 2000. Again, NMSU appeared on the list.

In November 2000, the DoD sent a letter to the United States Attorney for the District of New Mexico. Once more, the DoD affirmed that it "has used and continues to use the MI list provided by the Department of Education as the official list of institutions eligible to participate in the HBCU/MI programs." App. at 717. The DoD further affirmed that the list is based upon data submitted by "responding institutions" to the DoE. *Id.* at 718.

### 2. False Certifications

9

Defendants in this action are current and former NMSU administrators.[3] Between 1994 and 2000, each of the defendants, with the exception of Ms. Meyer,[4] signed various documents, including proposals, contracts, and solicitations from the DoD, on behalf of NMSU. These documents certified that NMSU qualified for minority-institution status under the DoD's set-aside program. Such certifications, in turn, became the basis for contractual awards to NMSU under the set-aside program.

Despite these certifications, relators introduced evidence at the summary judgment stage that NMSU may not have collected or maintained information about their Hispanic students' income levels or whether they were first generation college students. Relators also introduced evidence to suggest that minority students did not constitute 50% or more of NMSU's full-time undergraduate enrollment.

Thus, drawing all inferences in favor of relators, as we must for purposes of reviewing the grant of summary judgment, see *Selenke v. Med. Imaging of Colo.*,

---

[3] The list of defendants includes: the Estate of Thomas Davidson, former Director of the PSL; William Conroy, former President of NMSU; J. Michael Orenduff, former President of NMSU; Robert E. Weigle, former Director of the PSL; Donald Birx, current Director of the PSL; Miriam A. Gerber Meyer, current Director of Institutional Research at NMSU. We acknowledge that the respective employment statuses of the defendants may have changed during the pendency of this appeal; however, such changes (if any) would have no bearing on our resolution of this case.

[4] Ms. Meyer indicated on each application whether NMSU met the specified criteria and gathered statistics necessary to complete the application forms.

248 F.3d 1249, 1255-56 (10th Cir. 2001) ("[W]e view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."), we resolve the issues in this case under the view that: (1) NMSU never met the statutory criteria for a minority institution under the DoD's set-aside program during the relevant time period; and (2) both the DoD and the DoE incorrectly identified NMSU as a minority institution under this criteria.

### 3. Investigation and May 2, 2000, Certification

On April 19, 2000, a federal investigator from the Army's Criminal Investigation Command ("CID"), Kirby Rogers, met with Mr. Birx, the Director of the PSL, and Barbara Pritchard, NMSU's contract administrator. Mr. Rogers informed Mr. Birx and Ms. Pritchard of the statutory criteria governing eligibility for qualifying as a minority institution under the DoD set-aside program. Mr. Rogers also emphasized the apparent difference between this statutory criteria and that used by the DoE to furnish its minority-institution lists.

In response, Mr. Birx "acknowledged that he learned through recent conversations with Miriam Meyer that NMSU has not tracked low-income individuals (Hispanic) who are first generation college students." App. at 813. And, according to Mr. Rogers's report, Mr. Birx further admitted "that the evidence presented to him 'raised significant doubts (in his mind) that NMSU correctly certified itself as a minority institution.'" *Id.*

On May 2, 2000, less than two weeks after the meeting, Ms. Pritchard sent a

11

letter to a DoD contracting officer certifying NMSU's status as a minority institution. The May 2, 2000, letter averred that "we" were notified of the possible difference in eligibility criteria between the DoE's and the DoD's programs. App. at 818. Ms. Pritchard then certified that NMSU "has qualified for Minority Institution status under 48 CFR Chapter 2, Part 226.70 and 34 CFR 607.2 through 607.5 and has been placed on the Department of Education List of Title III eligible institutions for FY 1999." *Id.* The certification did not identify or discuss the statutory provisions governing the definition of a minority institution for purposes of the DoD set-aside program.

On February 1, 2002, the U.S. Army's Procurement Fraud Division sent a letter to NMSU. It asserted that NMSU "may have falsely certified itself as an MI." App. at 815. The letter further explained that, "[a]ccording to CID's investigation results, NMSU did not qualify as an MI under the above *statutory* criteria for the years 1996-1999." *Id.* Through this possibly fraudulent certification, NMSU received a grant from the DoD's Army Research Office in the amount of $8,445,899.

NMSU contacted the DoE for guidance. On August 8, 2002, Peter McCabe, a representative of the DoE's Office for Civil Rights, informed NMSU through e-mail that it "has been designated as a Hispanic serving institution in the 2002 Mino[ri]ty Postsecondary Institutions listing of the U.S. Department of Education." App. at 704. McCabe further confirmed that this listing was "not subject to editing

12

by other organizations." *Id.*

## C.    Procedural History

On December 14, 1999, relators, former employees of the PSL, filed a qui tam action against NMSU under the FCA. The FCA provides for liability for "[a]ny person" who, in various ways, knowingly presents a false or fraudulent claim to the United States. 31 U.S.C. § 3729(a). This liability may include up to treble damages. *Id.* The rights of the United States under § 3729 are enforceable through a qui tam action. *Id.* § 3730(b)(1).

The complaint alleged that NMSU, through Mr. Birx, his predecessors, and their designees, knowingly misrepresented NMSU's eligibility as a minority institution to obtain DoD set-aside contracts. Relators served the complaint on the government under seal pursuant to 31 U.S.C. § 3730(b)(2). During the government's investigation of relators' complaint, the Supreme Court decided *Stevens*, which held that a state agency is not a "person" within the meaning of the FCA. 529 U.S. at 787-88. On July 30, 2001, the United States filed a notice of election to decline to intervene. Relators filed a notice of voluntary dismissal on January 24, 2002, but failed to obtain the approval of the United States in accordance with 31 U.S.C. § 3730(b)(1) and later withdrew the notice of dismissal.

Instead, relators filed a motion to amend their complaint to replace NMSU with the current defendants in their individual capacities and the PSL, which was unsealed and served on defendants on March 20, 2003. Defendants opposed

13

relators' motion to amend on futility grounds, arguing in part that a state officer, like a state agency, is not a "person" subject to suit under the FCA and that the Eleventh Amendment bars a suit against state officers for performing conduct in the scope of their employment.

On May 4, 2004, the district court granted the motion to amend with respect to the individual defendants but denied the motion with respect to the PSL. The district court found the PSL, as a department of NMSU, to be an arm of the state. And, accordingly, it determined, *inter alia*, that relators' lawsuit against the PSL was barred by the Eleventh Amendment. However, the district court concluded that relators could sue defendants in their individual capacities under the FCA, even though they acted in the scope of their employment and obtained no personal benefit from making the alleged false claims.

On May 4, 2005, in light of the first amended complaint and relators' more definite statement, and subsequent to a brief period of discovery, defendants filed a motion for summary judgment. On November 15, 2005, the district court granted summary judgment. First, the district court held that qualified immunity functions as a defense under the FCA. Second, applying this defense, the district court concluded that relators failed to produce evidence from which a reasonable jury could find an FCA violation.

The district court divided relators' FCA claims into those arising prior to, and those arising after, April 19, 2000, when Mr. Rogers met with Mr. Birx and

14

voiced his concerns about NMSU's eligibility. With respect to the pre-April 2000 claims, the district court concluded that relators failed to introduce sufficient evidence from which a reasonable jury could find "that any Defendant engaged in a deliberate falsehood when certifying that NMSU qualified as an MI for purposes of DoD contracting." 400 F. Supp.2d at 1286. The district court then held that the only evidence in the summary judgment record of a minority-institution certification after April 2000, a May 2, 2000, letter to the DoD, was not false, since it disclosed "the possibility of a problem with NMSU's prior MI certification" and provided "an accurate certification as to the regulations and list under which NMSU did qualify as an MI." *Id*. at 1288.

Relators filed a timely notice of appeal on December 13, 2005. *See* Fed. R. App. P. 4(a)(1)(A). Defendants filed a timely cross-appeal on December 23, 2005. *See* Fed. R. App. P. 4(a)(3). We exercise jurisdiction over both appeals pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Relators challenge two aspects of the district court's order granting summary judgment. First, relators argue that the district court erred in recognizing the defense of qualified immunity for state officials who are sued in their individual capacity under the qui tam provisions of the FCA. Second, relators argue that the district court erred in holding that defendants were entitled to qualified immunity under the first prong of this defense. Relators contend that they introduced

15

sufficient evidence from which a reasonable jury could find that defendants "knowingly" misrepresented NMSU's eligibility for the DoD set-aside program.

Defendants' cross-appeal argues that the district court erred by permitting relators to amend their complaint to assert individual-capacity claims against defendants under the FCA. Defendants present two independent reasons for reversal: (1) state officials are not "persons" under § 3729(a) of the FCA, based upon the logic of *Stevens*; and (2) the Eleventh Amendment bars claims under the FCA against state officials in their individual capacity where, as in this case, such claims are de facto official-capacity claims—that is, the state (i.e., NMSU) is the real defendant in interest.[5] Defendants stress, however, that we only need to reach the merits of their cross-appeal in the event that we disturb the district court's merits-based grant of summary judgment against relators.

We agree that relators failed to put forth sufficient evidence from which a reasonable jury could find that any defendant violated the FCA. And because relators' FCA claims fail as a matter of law under a traditional summary judgment analysis—regardless of whether qualified immunity operates as a viable defense under the FCA—we leave that legal question (i.e., qualified immunity) for another

---

[5]    Defendants emphasize the absence of allegations that they either received a personal benefit from the false claims or acted outside the scope of their employment. In short, defendants contend that the district court's May 4, 2004, Order "undermines the Supreme Court's decision in *Stevens*, and allows *qui tam* plaintiffs to easily avoid the Eleventh Amendment protection that states (the real parties in interest) would otherwise enjoy." Aplee. Br. at 60.

16

day.

"[W]e may affirm the judgment of the district court on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *V-1 Oil Co. v. Means*, 94 F.3d 1420, 1423 (10th Cir. 1996); *see Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1217 n.15 (10th Cir. 2003) ("The district court granted Baker and Strayhorn's motions to dismiss based on qualified immunity grounds. However . . . there is no need to reach the issue of qualified immunity because the nurses were objectively reasonable in believing that CAP [the defendant ultimately responsible for coordinating the medical examination at issue] had obtained consent."); *cf. Gomes v. Wood*, 451 F.3d 1122, 1133 (10th Cir. 2006) (affirming due process claim on the alternative ground of qualified immunity); *Warner v. Grand County*, 57 F.3d 962, 964 (10th Cir. 1995) ("We affirm, but on the basis of qualified immunity rather than the common law."). Whether we analyze defendants' motion under traditional summary judgment standards or under the standards unique to the qualified immunity context, the key issue remains the same: whether the defendants acted with the requisite scienter—that is, whether they acted "knowingly" in wrongly certifying NMSU's eligibility for the DoD set-aside program. The parties vigorously litigated that issue and there is an ample record for us to render a legal ruling on it, albeit under a

17

different analytic framework than the district court.[6]

Thus, we affirm the district court's grant of summary judgment to defendants, but only on the ground that there is an absence of a genuine issue of material fact as to an FCA violation and defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Our resolution of relators' appeal renders defendants' cross-appeal—which defendants expressly conditioned on our reaching a result that would upset the district court's rulings in their favor—moot. Consequently, we pass no judgment on the propriety of the district court's analysis in ruling on relators' motion to amend.

### A. Conditional Cross-Appeal: Eleventh Amendment Immunity

Before reaching the merits of relators' appeal, we must address the propriety

---

[6] Lest we be misunderstood, we acknowledge our long-standing view that the task of district courts, and consequently appellate courts, is different in reviewing motions for summary judgment under traditional standards and qualified immunity principles. *See, e.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) ("Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." (internal quotation marks omitted)); *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1204 (10th Cir. 2008) (same). Indeed, courts should exercise care not to confuse the two analytic frameworks. Admittedly, at least in some instances, this apparently is easier said than done. *See, e.g.*, Alan K. Chen, *The Facts About Qualified Immunity*, 55 Emory L.J. 229, 229-30 (2006) ("The legal system continues to struggle with qualified immunity . . . ."); Charles R. Wilson, *"Location, Location, Location": Recent Developments in the Qualified Immunity Defense*, 57 N.Y.U. Ann. Surv. Am. L. 445, 447 (2000) (Circuit Judge of Eleventh Circuit commenting, "Wading through the doctrine of qualified immunity is one of the most morally and conceptually challenging tasks federal appellate court judges routinely face.").

of declining to first resolve the jurisdiction-related Eleventh Amendment questions raised in defendants' conditional cross-appeal. Both the government as amicus curiae and the defendants contend that we only need address whether the Eleventh Amendment bars relators' claims *if* and *when* we reach defendants' conditional cross-appeal.

While "[q]uestions of jurisdiction, of course, should be given priority," *Stevens*, 529 U.S. at 778, the Supreme Court, addressing the FCA, recently declared appropriate the prior resolution of a statutory question—that is, "whether the statute itself *permits* the cause of action it creates to be asserted against States." *Id.* at 779. In such a circumstance, "there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed," *id.*, and the statutory question is "'logically antecedent to the existence of' the Eleventh Amendment question." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997) (choosing to first address the propriety of class-certification, because it was "logically antecedent to the existence of any Article III issues")).

However, the Supreme Court has not determined whether a federal court may reach a broader class of merits-based questions, beyond whether the statute's text precludes invocation against a state, before resolving an assertion of Eleventh-Amendment immunity raised through a conditional cross-appeal. Nor have we previously opined on the subject. We believe that, in such a unique procedural

19

context, a federal court may address the merits-related question *before* reaching the Eleventh Amendment question.

We tackle this interesting procedural issue by first describing the relevant characteristics of the Eleventh Amendment and the immunity it offers.[7]  Eleventh Amendment immunity doctrine is not easy to characterize.  It shares features with affirmative defenses, while also containing traits more akin to subject-matter jurisdiction.  *See Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 558 (10th Cir. 2000).  It is best understood according to its own unique identity, rather than through its similarities with other legal doctrines.  In other words, "the Eleventh Amendment occupies its own unique territory."  *Floyd v. Thompson*, 227 F.3d 1029, 1035 (7th Cir. 2000).

For purposes of our sequence-of-issues analysis, Eleventh Amendment immunity possesses three main features.  First, it may be raised at any time, even on appeal for the first time.  *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 677-78 (1974); *Archuleta v. Lacuesta*, 131 F.3d 1359, 1362 (10th Cir. 1997).  Second, like an affirmative defense, it may be waived by the affected party.  *See, e.g.*, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) ("A State can waive its

---

[7]    The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  We recently had occasion to summarize some Eleventh Amendment immunity principles.  *See Tarrant Reg'l Water Dist. v. Sevenoaks*, 545F.3d 906, 911 (10th Cir. 2008).

Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it."); *Archuleta*, 131 F.3d at 1362 ("[I]t can be waived by the affected party."). Third, a court may raise the issue of Eleventh-Amendment immunity sua sponte but, unlike subject-matter jurisdiction, it is not obligated to do so. *See, e.g.*, *Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("Nor need a court raise the defect on its own."); *Nelson v. Geringer*, 295 F.3d 1082, 1098 n.16 (10th Cir. 2002) ("[T]he [Supreme] Court has stated that judicial consideration of Eleventh Amendment issues sua sponte is discretionary, not mandatory."). The net effect of these characteristics is that a state defendant retains broad discretion over whether a court must hear an Eleventh Amendment argument that may end the litigation. As more succinctly stated by the Supreme Court, "[u]nless the State raises the matter, a court can ignore it." *Schacht*, 524 U.S. at 389.

This is not a case in which the State defendant (or those purportedly covered by the State's immunity) has directly asserted Eleventh Amendment immunity. If a State defendant had asserted it, addressing the threshold jurisdictional matter would be obligatory.[8] Without such an assertion, we are not obligated to resolve the

---

[8] When a state raises such an argument on appeal, it must be decided and, almost always, it must be decided prior to reaching the merits of the underlying claim. *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1259 (10th Cir. 2002). As we stated in *Martin v. Kansas*, 190 F.3d 1120 (10th Cir. 1999), *overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), "[b]ecause the State's assertion of Eleventh Amendment

(continued...)

Eleventh Amendment issue.  *See Fent*, 235 F.3d at 559 ("*[O]nce effectively asserted* such immunity constitutes a bar to the exercise of federal subject matter jurisdiction.").  In filing their *conditional* cross-appeal, defendants have asked us expressly, as a first task, to resolve relators' appeal.  Put differently, defendants have chosen not to assert Eleventh Amendment immunity *unless* we reverse the district court's merits-related decision.  *See Hartman v. Duffey*, 19 F.3d 1459, 1465 (D.C. Cir. 1994) (Wald, J., concurring) (noting that a conditional cross-appeal protects contingent interests of a party victorious before the district court under theory that "as soon as the appellate court decides to modify the trial court's judgment, that judgment may become 'adverse' to the cross-appellant's interests and thus qualify as fair game for an appeal").  Because we affirm the grant of summary judgment, defendants have *not* asserted Eleventh Amendment immunity on appeal.[9]

---

[8](...continued)
immunity challenges the subject matter jurisdiction of the district court, the issue must be resolved before a court may address the merits of [plaintiff's] underlying . . . claim."  190 F.3d at 1126; *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (same).  We have even applied this principle to a cross-appeal that challenged the denial of Eleventh Amendment immunity.  *See Frazier v. Simmons*, 254 F.3d 1247, 1252 (10th Cir. 2001).

[9]     *See* 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3902, at 78 (1992 and 2007 Supp.) ("A party who fully prevailed in the district court may have an equally obvious justification for cross-appeal, to protect interests that otherwise might be adversely affected by disposition of the appeal.  Courts readily understand this principle, and have applied it without difficulty, permitting the cross-appeals but

(continued...)

22

This approach seems to be consistent with that taken by several other circuits. *See, e.g.*, *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006) (bypassing "alternative" assertion of Eleventh Amendment and affirming summary judgment based upon merits of claims under First Amendment and Michigan's Whistleblower's Protection Act; reasoning that "under any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, we conclude that the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer"); *Strawser v. Atkins*, 290 F.3d 720, 729-30 (4th Cir. 2002) (concluding that a State's "restricted use" of Eleventh Amendment immunity permits a federal court to bypass the Eleventh Amendment question and affirm on the merits of the claim, "independent" of whether the statutory question related to the merits of the claim is logically antecedent to the Eleventh Amendment analysis).[10]

---

[9](...continued)
deciding them *only if* disposition of the appeal makes it appropriate." (emphasis added)).

[10]    Some circuits have endorsed, albeit in dicta, the logic underlying this approach. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 418 n.15 (3d Cir. 2003) (reasoning that because the state defendant "urges that 'the right of action . . . question should be addressed first,'" prior to Eleventh Amendment questions, "conceptually, at least, we could hold that it has waived its Eleventh Amendment immunity to that very limited extent"); *United States ex rel. Long v. SCS Bus. & Technical Inst.*, 173 F.3d 890, 892-93 (D.C. Cir. 1999) (observing that state defendant's "explicit request that we first decide the statutory question
(continued...)

Most similar to the procedural context of this case is *McClendon v. Georgia Department of Community Health*, 261 F.3d 1252 (11th Cir. 2001). There, defendants presented two arguments to affirm the district court's dismissal—that plaintiffs failed to state a claim upon which relief can be granted and that plaintiffs' claims were barred by the Eleventh Amendment. *Id.* at 1257-58. The Eleventh Circuit interpreted "defendants' position as a *conditional* assertion of Eleventh Amendment sovereign immunity—they insist upon that defense *only if* it is necessary to prevent judgment against them on the merits." *Id.* at 1258 (emphasis added). After describing the "elective nature of the Eleventh Amendment's jurisdictional bar," *id.* at 1257, and after surveying the relevant caselaw, *id.* at 1258-59, the *McClendon* Court held that the "*conditional* assertion of the Eleventh Amendment gives a federal court the discretion to dispose of the merits favorably to the state or its officials if it chooses to do so." *Id.* at 1259 (emphasis added). It then chose to exercise this discretion, reasoning that the Eleventh Amendment issues were much more difficult than the merits of plaintiffs' claim. *Id.*

Furthermore, this approach does not conflict with the Supreme Court's prohibition of "hypothetical jurisdiction." In *Steel Co. v. Citizens for a Better*

---

[10](...continued)
could therefore be seen as a kind of agreement to assert its Eleventh Amendment defense *only* if it loses on the statutory one" and that "it may well be that [the State defendant's] approach amounts to a partial consent to suit on the statutory question—subject to a later Eleventh Amendment defense").

24

*Environment*, 523 U.S. 83 (1998), the Supreme Court rejected the practice of assuming Article III jurisdiction for the purpose of deciding a merits-based question. *See id.* at 94. The Court reasoned that this approach "offends fundamental principles of separation of powers," since it permits the judicial branch to act ultra vires by circumventing the "requirement," grounded in Article III of the Constitution, "that jurisdiction be established as a threshold matter." *Id.* at 94-95. Although the Supreme Court recognized that certain cases "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question," *id.* at 101, it reaffirmed the general precept that "a merits question cannot be given priority over an Article III question." *Id.* at 97 n.2.

We have extended *Steel Co.*'s prohibition against hypothetical jurisdiction to preclude requests to bypass an assertion of Eleventh Amendment immunity. Specifically, we have concluded that "[*o*]*nce effectively raised*, the Eleventh Amendment becomes a limitation on our subject-matter jurisdiction, and we may not then assume 'hypothetical jurisdiction' to reject a plaintiff's claim on the merits." *Harris v. Owens*, 264 F.3d 1282, 1288 (10th Cir. 2001) (emphasis added). Whether immunity has been "effectively raised" is significant because the Eleventh Amendment, unlike Article III's "Cases" or "Controversies" mandate, imposes no "special obligation" on a federal appellate court to ensure its own jurisdiction or that of the district court, "even though the parties are prepared to concede it." *Steel Co.*, 523 U.S. at 95 (internal quotation marks omitted); *see also Calderon v.*

25

*Ashmus*, 523 U.S. 740, 745 n.2 (1998) (recognizing that Eleventh Amendment "is not coextensive with the limitations on judicial power in Article III"). Since Eleventh Amendment immunity necessarily becomes an antecedent question of jurisdictional proportions only when "effectively raised," *Harris*, 264 F.3d at 1288, the logic of *Steel Co.* and *Harris* dictates that here, faced with a *conditional* cross-appeal, we *may* first resolve the merits of relators' claims. *See McClendon*, 261 F.3d at 1258-59; *Betts v. Rector and Visitors of Univ. of Va.*, 198 F. Supp. 2d 787, 796 (W.D. Va. 2002) ("When the defendant expresses a willingness for the court to decide a case in its favor on the merits without deciding whether the defendant is entitled to Eleventh Amendment immunity, the court makes no assumptions of law declaring power that violates the principles underlying *Steel Co.*").

## B.     Merits of FCA Claims

The district court granted summary judgment to each defendant on each claim. After reasoning that the defense of qualified immunity is available under the qui tam provisions of the FCA, the district court held that relators' claims foundered on the first prong of the qualified immunity test. That is, the district court found no evidence to suggest that any defendant violated the FCA.

We review this decision de novo. *See Selenke*, 248 F.3d at 1255. Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the

entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). In applying this standard, "[t]he evidence of

[relators] is to be believed, and all justifiable inferences are to be drawn in [their]

favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

We affirm the district court's legal conclusion that no reasonable jury could

find an FCA violation from the evidence relators presented at the summary

judgment stage.[11] Like the district court, we separate relators' allegations into two

groups of allegedly false certifications—divided by Mr. Rogers's April 19, 2000,

notification to Mr. Birx about the differences between the DoE's standards for

minority-institution status and the statutory criteria of the DoD's set-aside program.

### 1. FCA Claims Based Upon Pre-Notification Conduct

Relators alleged that defendants' false certifications violated § 3729(a)(1)-

(3) of the FCA. To succeed on their qui tam claims, relators must prove that

defendants "knowingly" presented a false claim to the government for payment or

---

[11] We assume *arguendo* that defendants are "persons" within the meaning of § 3729(a) of the FCA. This assumption is appropriate because, again, defendants only challenge the district court's resolution of this statutory question as part of their *conditional* cross-appeal. And, even if defendants had pressed this issue as their primary response to relators' appeal, we would not be obligated to decide this non-jurisdictional question before resolving whether relators put forward enough evidence to raise a genuine issue of material fact as to the merits of their FCA claims. *See Steel Co.*, 523 U.S. at 97 n.2 (confirming "that a merits question can be given priority over a statutory standing question").

approval, 31 U.S.C. § 3729(a)(1); or that defendants "knowingly" utilized the false statement to get the government to pay a false claim, *id.* § 3729(a)(2); or that defendants conspired to "defraud" the government by getting it to pay a false claim, *id.* § 3729(a)(3). The scienter requirement can be satisfied by "reckless disregard of the truth or falsity of the information."[12] *Id.* § 3729(b). And "no proof of specific intent to defraud is required." *Id.*

The district court held that relators provided sufficient evidence to raise a genuine issue of material fact as to whether defendants submitted false claims by misrepresenting their eligibility for the DoD set-aside program. Nonetheless, the district court concluded that, even if the claims were false, relators failed to provide sufficient evidence from which a reasonable jury could find that defendants *knowingly* made these false claims.

The district court offered a two-part rationale to justify its conclusion. First, the district court reasoned that the undisputed evidence in the record established that: (a) the DoD had a policy of relying upon the DoE's lists of minority institutions—on which NMSU appeared—to determine eligibility for the DoD set-

---

[12]     The FCA prescribes three definitions of "knowingly." 31 U.S.C. § 3729(b). A defendant acts "knowingly" when he has "actual knowledge of the information"; or when he acts "in deliberate ignorance of the truth or falsity of the information"; or when he acts in "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)-(3). Thus, an aggravated form of gross negligence (i.e., reckless disregard) will satisfy the scienter requirement for an FCA violation. *See United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997).

28

aside program; and (b) defendants relied upon this policy in certifying NMSU's minority-institution status. Second, the district court concluded that defendants' reliance upon the DoE's lists without independently verifying NMSU's statutory eligibility was at most negligent and did not, as a matter of law, evince a reckless disregard for the truth.

Relators challenge the district court's reasoning. First, relators argue that the district court failed to construe the evidence in the light most favorable to them when it found to be undisputed the DoD policy of relying on the DoE's lists and defendants' reliance upon the DoD's documents reflecting that policy. Second, even if the record unambiguously establishes these facts, relators argue that the district court erred when it held, as a matter of law, that the scienter requirement was negated by defendants' reliance upon the DoD's possible misidentification of NMSU as a minority institution.

### a. Undisputed Material Facts

Relators contend that the evidence in the record does not suggest either that (a) the DoD consistently deferred to the DoE's minority-institution eligibility lists, on which NMSU consistently appeared, or (b) defendants knew about and relied upon any such policy in declaring NMSU to be a minority institution. At the very least, relators assert that the evidence in support of these facts was incomplete and ambiguous. We reject relators' arguments.

### i. DoD Policy

The district court properly found as an undisputed fact that the DoD, however mistakenly, determined eligibility for its set-aside program between 1994 and 2001 from the DoE's minority-institution lists, on which NMSU regularly appeared. The evidence unambiguously supports this conclusion. For instance, an April 1, 1994, memorandum from the Director of the DoD's Office of Small and Disadvantaged Business Utilization attached "a list of institutions provided to DoD by the Office of Civil [R]ights within the Department of Education that qualify as minority institutions." App. at 629. According to that April 1994 memorandum, these schools "were identified by the Department of Education in response to our request for a list of schools that meet the new minority institution criteria contained in Section 811 of P.L. 103-160 . . . . This list is effective immediately." *Id*. The April 1994 memorandum further stated that schools not appearing on the list should contact the "Office of Civil [R]ights with the Department of Education" and that the list should be distributed to the "appropriate contracting activities." *Id*. NMSU appeared on that list.

A 1996 announcement of DoD set-aside grants highlighted 10 U.S.C. § 2323(a)(1)(C), the statutory provision governing eligibility criteria, and then attached the "most recent" list of "certified minority institutions" meeting this criteria. App. at 886. The DoD announcement explained that this list—spanning 1995 and 1996—was "compiled by the Office for Civil Rights, U.S. Department of Education, as specified in 20 U.S.C. 1135d-5(3), using enrollment data reported by

30

postsecondary institutions." *Id.* Again, NMSU appeared on the DoE's list.[13]

An August 2000 DoD announcement for university research grants "encouraged" proposals from minority institutions, noting that the "Department of Education maintains the list of U.S. accredited postsecondary institutions that currently meet the statutory criteria for identification as minority institutions." App. at 689. Once more, NMSU appeared on the DoE's list for 2000.

In November 2000, the Director of the DoD's Office of Small and Disadvantaged Business Utilization confirmed in a letter to the United States Attorney for the District of New Mexico that the DoD "[h]istorically . . . has used and continues to use the MI list provided by the Department of Education as the official list of institutions eligible to participate in the HBCU/MI programs." *Id.* at 717. The November 2000 letter further identified the then-applicable DoD criteria, *see* 20 U.S.C. §§ 1059c, 1067k(3), as the criteria the DoE used to determine minority-institution status. App. at 718-19.

_____

[13] Relators argue that the April 1, 1994, memorandum and the 1996 announcement did not evidence a DoD policy in part because the list attached to the April 1994 memorandum "established that NMSU had a minority enrollment of only 35.25% and therefore did not qualify as a minority institution under DoD's new criteria [20 U.S.C. § 1135d-5(3)]." Aplt. Br. at 43, 45. This logic is unconvincing. The fact that NMSU may not have met the statutory criteria says nothing about whether the DoD relied upon the DoE's minority institution lists as proof of eligibility. These are two unrelated inquiries. Both the April 1994 memorandum and the 1996 announcement can be viewed only as establishing the DoD's policy, *however legally incorrect*, of relying upon the DoE's certified lists for identifying those institutions which satisfied the statutory criteria of the set-aside program.

The DoD's policy of relying upon the DoE's certification lists can be seen as an understandable, if unfortunate, byproduct of the relevant statutory scheme. From 1994 until 2000, the definition of "minority institutions" for the DoD set-aside program cross-referenced the definition of "minority institutions" under the HEA. 10 U.S.C. § 2323(a)(1)(C) (1994 & 2000). The HEA, in turn, imposed responsibility on the SOE to verify minority-institution status from data furnished by universities through enrollment surveys. 20 U.S.C. § 1135d-5(3) (1994) (recodified at 20 U.S.C. § 1067k(3) (2000)).

This policy was then expressly enshrined in the regulations promulgated by the DoD. To be sure, these regulations did not directly predicate the *definition* of a "minority institution" upon a certification from the SOE, as they did for "historically black colleges and universities." 48 C.F.R. § 252.226-7000(a) (2000) ("Historically black colleges and universities, as used in this clause, means institutions determined by the Secretary of Education to meet the requirements of 34 CFR 608.2."); *id.* § 226.7005(b)(2) (noting that a "list of HBCUs is published periodically by the Department of Education"). However, they *expressly* permitted an offeror to demonstrate its minority-institution status, prior to receiving a DoD contract, by showing that "the Secretary of Education has determined the offeror to be a historically black college or university or minority institution." 48 C.F.R. § 252.226-7000(c)(2) (2000).

## ii.    Defendants' Reliance

32

The district court also found, as an undisputed fact, that defendants relied upon this policy—the DoD's ongoing confirmation that an institution was eligible if it appeared on the DoE's minority-institution lists—in applying for DoD set-aside contracts. Because relators offer no evidence to suggest that defendants did not rely upon the DoD's policy, we agree.

With respect to Mr. Birx, such reliance is asserted in his affidavit in support of defendants' summary judgment motion. In this affidavit, Mr. Birx averred that NMSU received the April 1994 memorandum, the 2000 DoD announcement, and the DoE's list of minority institutions for 2000. There is also no dispute that NMSU received the 1996 announcement, and that various DoD solicitations in 1999, which resulted in contractual awards to NMSU, expressly linked minority-institution status with proof of SOE certification.

Mr. Birx then averred that, based at least upon the 1994 and 2000 documents,[14] he personally signed minority institution contracts on behalf of

---

[14]     Mr. Birx also relied upon annual letters declaring NMSU to be an "eligible institution" under the regulations governing the Strengthening Institutions Program of Title III of the HEA. These letters, however, never recognized NMSU's minority-institution status. Nor did they reference the statutory criteria for the DoD set-aside program. Instead, they confirmed NMSU's eligibility under separate programs with seemingly less rigorous criteria. *Compare* 20 U.S.C. §§ 1135d-5(3), 1059c(b)(1) (1994) (eligibility criteria to qualify as "minority institution" under the DoD set-aside program) *with* 34 C.F.R. § 607.2 (1994) (eligibility criteria under Strengthening Institutions Program). And there is no evidence that the DoD relied, rightly or wrongly, upon the DoE's declarations of eligibility under the Strengthening Institutions Program as proof of minority institution status. We therefore agree with relators that these letters

(continued...)

NMSU. He further professed reliance upon statements of minority-institution eligibility "repeated to me by numerous NMSU administrators and also by contracting officers from various agencies within the DOD." App. at 595. Relators point to no evidence in the record to dispute Mr. Birx's assertion of reliance.

The remaining defendants did not offer affidavits averring that they knew about or relied upon the DoD's policy of deferring to the DoE's eligibility lists. Nonetheless, this is the only reasonable inference to be drawn from the following undisputed facts: (1) NMSU received the relevant DoD documents and DoE lists; (2) NMSU was eligible for DoD set-aside contracts prior to the 1993 changes, and the April 1994 memorandum reached NMSU before the issuance of all the false certifications;[15] (3) either the DoD's policy or the DoE's designation of NMSU as a minority institution, or both, appeared in many of the DoD's solicitations to NMSU for set-aside proposals; (4) defendants, as high-ranking administrators, were the primary recipients of the DoD's communications with NMSU; and (5) defendants

---

[14](...continued)
"have absolutely no bearing on whether DoE had determined NMSU met the new criteria or was eligible to participate in DoD's HBCU/MI program." Aplt. Reply Br. at 23. As such, we give them no significance in our analysis.

[15]     Relators' allegations suggest one possible exception, but we find no evidentiary support for it. Specifically, in a district court pleading particularizing their allegations, relators stated that Mr. Conroy knowingly made a false certification concerning NMSU's minority-institution status in January 1994. *See* App. 504 (Relators' More Definite Statement, dated Dec. 14, 2004). However, relators have not identified evidence in the record to support this allegation. Nor could we find any.

34

submitted proposals to the DoD on behalf of NMSU. Again, relators offer no evidence to suggest that defendants did not rely upon the DoD's policy.

### b. Scienter Element

Armed with these undisputed facts, the district court concluded that no reasonable jury could find that defendants acted with the requisite scienter in certifying NMSU as a minority institution. The district court reasoned that "[g]iven this statutory and regulatory background apparently authorizing the DOD to rely on the DOE's MI determinations . . . . [and] given the government's assurances, Defendants' failure to research the statutes and investigate the facts themselves constituted [at most] only negligent behavior, rather than reckless or deliberate action." 400 F. Supp. 2d at 1286.

Relators challenge this analysis. They claim that a reasonable jury could find that defendants' reliance upon DoD and DoE documents in certifying NMSU's minority-institution status exceeded mere negligence. Specifically, they argue that defendants acted with deliberate ignorance by relying blindly upon the DoE's lists, by ignoring signs that NMSU did not in fact meet the applicable statutory criteria, and by failing to verify independently whether NMSU satisfied these criteria.

As an initial matter, we agree that relators identified enough evidence from which a reasonable jury could find that defendants acted negligently. The primary support for finding negligence is the evidence suggesting that NMSU lacked the necessary data to determine whether it qualified as a minority institution under the

35

relevant statutory criteria. For instance, defendants should have known from the DoD's April 1994 memorandum that NMSU contained a minority enrollment of 35.25%, less than the 50% required to qualify as a "minority institution." *See* 20 U.S.C. § 1135d-5(3) (1994) (recodified at 20 U.S.C. § 1067k(3) (2000)). Other evidence in the record also suggests that NMSU did not meet the 50% minority enrollment threshold for many, if not all, of the years during this period.[16] Furthermore, Mr. Birx admitted in April 2000 that NMSU had not adequately tracked low-income, first-generation Hispanic students, thereby lacking information as to whether NMSU qualified as a "Hispanic-serving institution." *See* 20 U.S.C. § 1101a(a)(5) (2000). Therefore, despite their obligation to "know the law" and to "act with scrupulous regard for the requirements of law," *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984), it appears that defendants breached this duty by never independently verifying whether NMSU satisfied the statutory criteria for minority-institution eligibility.

Nonetheless, numerous courts have observed that simple negligence does not violate the FCA. *See, e.g.*, *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 742 (7th Cir. 2007) (declaring that under § 3729(b)'s definition of "knowingly," "'innocent' mistakes or negligence are not actionable"), *cert. denied*,

---

[16] The record indicates that NMSU officials did not announce the attainment of 50% minority enrollment until October 2001. And summaries of the racial composition of NMSU's student body suggests that this 50% threshold was not crossed at NMSU's main campus for any of the years between 1996 and 1999.

128 S. Ct. 1246 (2008); *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1150 (9th Cir. 2004) ("Negligence and innocent mistake are insufficient to meet the intent requirement under the FCA."); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002) ("[I]nnocent mistakes and negligence are not offenses under the Act." (quotation marks omitted)); *see also United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992), for the proposition that "poor job performance and innocent mistakes are not actionable under the False Claims Act"). We agree with their reading of the FCA. And, after reviewing the summary judgment record as a whole, we believe that no reasonable jury could find that any of the defendants acted in more than a negligent manner.

Three reasons support our conclusion: (1) the lack of scienter-based evidence in the record; (2) the government knowledge inference; and (3) the text of the applicable statutory and regulatory scheme.

### i. Lack of Scienter-Based Evidence

We are initially struck by what is not in the record. For instance, relators identify no deposition testimony from any defendant relevant to the issue of scienter. Nor did relators submit any such testimony in response to defendants'

37

summary judgment motion.[17]  Moreover, although relators alleged that each defendant made at least one false certification, they adduced virtually no evidence of defendants' conduct—or knowledge—prior to April 19, 2000.  Indeed, there is no evidence that defendants intentionally ignored the statutory criteria; that they appreciated the significance of, yet disavowed, statistical data foreclosing NMSU's eligibility as a minority institution; or that they purposefully refused to verify the relevant demographics of NMSU's student body.  And there is certainly no evidence of a conspiracy to defraud.

We find these evidentiary failures to be particularly significant in light of relators' obligation at the summary judgment phase to produce sufficient evidence that each individual defendant—not the PSL as an institutional whole—"knowingly" submitted a false claim.  *See Madonna Towers*, 278 F.3d at 769 (affirming summary judgment for the operator of a nursing facility because relator's sole evidence of scienter—"deposition testimony by facility officials that they did not seek legal advice concerning the propriety of their billing practices,"—failed to even suggest that anyone "suspected something [was] wrong but deliberately avoided learning more so that a fraudulent scheme could

---

[17]  We note that relators did produce five pages of deposition testimony from Ms. Meyer, in which she confirmed her responsibility for gathering data relevant to NMSU's minority-institution status.  App. at 786-91.  This testimony sheds little, if any, light on the issue of scienter.  Seemingly recognizing this fact, relators never cited this testimony to support their summary judgment analysis as to why Ms. Meyer and the remaining defendants acted with the requisite scienter.  Nor do they do so on appeal.

continue").

Relators cite several pieces of evidence that purportedly raise an inference of scienter as to all defendants: (1) the list attached to the April 1994 memorandum which identified NMSU as having a minority enrollment of 35.25%; (2) a December 1, 1999, e-mail discussing NMSU's capacity to track the first-generation and low-income data of its student body; and (3) Mr. Rogers's report of his April 19, 2000, meeting with Mr. Birx. None of these documents supports an inference of the requisite scienter.

The April 1, 1994, list was issued in conjunction with a memorandum that informed NMSU that, if it appeared on the DoE's list, it was eligible for the DoD set-aside program. We fail to see how NMSU's appearance on a list confirming DoD set-aside *eligibility* generates knowledge—or avoidance of knowledge—of *ineligibility*. The record is also barren as to whether any of the defendants recognized the significance of the minority enrollment statistic in 1994 or in any subsequent year. More importantly, even if certain defendants should have known from the April 1, 1994, list that NMSU did not qualify under 20 U.S.C. § 1135d-5(3), which imposed the 50% minority-enrollment threshold, the list did not foreclose NMSU from qualifying under 20 U.S.C. § 1059c(b)(1). In fact, it revealed that NMSU had a Hispanic enrollment of nearly 30%, one of three relevant conditions for eligibility as a "Hispanic-serving institution." See 20 U.S.C. § 1059c(b)(1)(B) (1994).

Relators next cite a December 1, 1999, e-mail from an employee of NMSU to relator Donald Bustamante. The e-mail stated that because it was only in the "past few years" that a "'first generation' question has appeared on the undergraduate admission application form[,] . . . . [t]he student file has no information regarding this status for students who were admitted to NMSU before this question was asked, nor for most graduate students." App. at 851. The e-mail further stated that "the only method we have of determining low income status for students at NMSU is to review the student's financial aid record for household income and size, and compare that to national low income guidelines." *Id.* If no financial aid report was filed, then no "determination" was made. *Id.*

No reasonable jury could infer actual knowledge, reckless disregard, or deliberate indifference from this e-mail. For starters, Ms. Meyer was the only defendant copied on the e-mail, and relators present no evidence that any other defendant was aware of its content. Nor is this content, on its own, particularly suggestive. By the time Ms. Meyer received the e-mail,[18] the first-generation status of Hispanic students was no longer a criterion in qualifying as a Hispanic-serving institution. 20 U.S.C. § 1101a(a)(5) (2000) (requiring 25% of undergraduate

---

[18] The only evidence in the record pertaining to Ms. Meyer's level of awareness prior to December 1, 1999, suggests that she believed, however mistakenly, that NMSU *did* qualify as a minority institution. On March 9, 1998, she sent an e-mail to Mr. Birx and other NMSU administrators confirming that NMSU "has been reauthorized as a *minority institution* under Title III of the Higher Education Act by the U.S. Department of Education." App. at 665 (emphasis added).

students to be Hispanic and at least 50% of Hispanic students to be "low-income individuals"). And the e-mail does not concede that NMSU never collected information about low-income status, but that NMSU had "only" one method, however partial, of doing so. *Id.*

Relators' final piece of evidence—Mr. Rogers's report memorializing Mr. Birx's comments in April 2000—also fails to carry their burden of proof. According to Mr. Rogers's report, Mr. Birx "acknowledged that he learned through *recent* conversations with Miriam Meyer" of NMSU's failure to track statistics concerning low-income, first-generation Hispanic students. *Id.* at 813 (emphasis added). He further admitted that "the evidence presented to him 'raised significant doubts (in his mind) that NMSU correctly certified itself as a minority institution.'" *Id.*

These comments, without more, offer no insight into Mr. Birx's state of mind—or his conduct—*prior* to his "recent" conversation (of an undisclosed date) with Ms. Meyer. Furthermore, Mr. Birx's comments say nothing about the scienter of the other defendants (with the exception of Ms. Meyer), nearly all of whose false claims were submitted prior to 2000. And, with respect to Ms. Meyer, Mr. Rogers's report attributes to her, through multiple levels of hearsay, no more than what she knew through the December 1, 1999, e-mail.

In summary, we believe that the evidence cited by relators—whether analyzed individually or collectively—fails to create a genuine issue of material

41

fact as to scienter. But, even if this evidence somehow did raise a weak inference that a particular defendant, such as Ms. Meyer or Mr. Birx, "knowingly" misrepresented NMSU's eligibility, this would not be enough to reach a jury. Relators' evidence cannot be evaluated in a factual and legal vacuum. As we now explain, the government knowledge inference, coupled with the applicable statutory and regulatory scheme, preclude a reasonable jury from finding scienter.

##### ii. Government Knowledge Inference

The "government knowledge inference" helps distinguish, in FCA cases, between the submission of a false claim and the *knowing* submission of a false claim—that is, between the presence and absence of scienter. *See United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (collecting cases); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000); *cf. United States v. Southland Mgmt. Group*, 326 F.3d 669, 682 n.8 (5th Cir. 2003) (en banc) (Jones, J., concurring) (noting that some courts have "inaptly named" this government knowledge theory a "defense" whereas "it is not a statutory defense to FCA liability"). This inference arises when the government knows and approves of the facts underlying an allegedly false claim prior to presentment. *See Becker*, 305 F.3d at 289 ("[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter for an FCA violation."); *cf. United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group Inc.*, 400 F.3d 428, 455 n.21 (6th Cir. 2005) (holding that defendant's "argument that liability is precluded by the Government's knowledge is unpersuasive," in part because defendant "neglected to disclose all the pertinent information" in filing the claim).

A classic example is when the government, with knowledge of the facts underlying an allegedly false claim, authorizes the contractor to make that claim. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) ("The government

43

knew of all the deficiencies identified by Wang, and discussed them with FMC. The fact that the government knew of FMC's mistakes and limitations, and that FMC was open with the government about them, suggests that while FMC might have been groping for solutions, it was not cheating the government in the effort."). In such a situation, an inference arises that the contractor has not "knowingly" presented a fraudulent or false claim. *See Becker*, 305 F.3d at 289; *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("As the brief of the United States points out, the knowledge possessed by officials of the United States may . . . . show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth"); 1 John T. Boese, Civil False Claims and *Qui Tam* Actions § 2.06[E] (3d ed. 2005 & 2007-1 Supp.) ("Government knowledge . . . is relevant to the element of intent.").[19]

It is only an inference. It does not *automatically* preclude a finding of scienter. *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993) ("[T]he defendant's knowledge of the falsity of its claim . . . is not automatically exonerated by any overlapping knowledge by government officials."); *see Southland Mgmt. Group*, 326 F.3d at 682 n.9 (Jones, J.,

---

[19] Some courts also apparently have viewed government knowledge as "relevant" to the "purported falsity of the claims"—that is, as supportive of the legal conclusion that the claims cannot be deemed "false" under the FCA. 1 Boese, *supra*, § 2.03[F] (2007-2 Supp.). Mr. Boese suggests that the Seventh Circuit subscribes to this view, citing *United States ex rel. Durcholtz v. FKW Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("[T]he government's knowledge effectively negates the fraud or falsity required by the FCA.").

concurring) ("Courts have qualified the importance of government knowledge by stating that it may not always provide a conclusive defense to the claimant"); *United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, 564 (E.D. Va. 2003) ("A contractor's disclosure . . . to the government is relevant, not because government knowledge of a misrepresentation shields a contractor from liability, but because evidence of disclosure may 'point[ ] persuasively away from any conclusion that [the contractor] made a knowing misrepresentation.'" (quoting *X Corp. v. Doe*, 816 F. Supp. 1086, 1094 (E.D. Va. 1993)). The proper focus of the scienter inquiry under § 3729(a) must always rest on the defendant's "knowledge" of whether the claim is false, a knowledge which may certainly exist even when a government agency misinterprets its own regulations and chooses—with full comprehension of the facts—to pay a false claim. *See Southland Mgmt. Group*, 326 F.3d at 682 & nn.8, 9 (Jones, J., concurring) (noting that the government knowledge inference is simply "a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim" and identifying a non-exhaustive set of scenarios where the inference "would not be effective"); *Hagood*, 929 F.2d at 1421.

Although we have never applied the government knowledge inference, we have acknowledged its viability. In *Shaw*, we noted that the statutory government

knowledge *defense* was removed from the FCA in 1986.[20] 213 F.3d at 534. We quickly emphasized, however, that "there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." *Id*. We then concluded that the facts of *Shaw* did not present such an occasion, in part because the defendant was not "forthcoming" with the government about the contractual failures and billing inflations that formed the basis for the false claims. *Id.* at 534-35.

By contrast, the government knowledge inference is well-suited to the facts of this case, where both governmental knowledge *and* governmental cooperation are present. Here, the DoE had access to NMSU's enrollment data. Consistent with its statutory obligation, the DoE reviewed this data and repeatedly designated NMSU as a minority institution. Based upon these designations, the DoD invited NMSU to apply for set-aside contracts, confirming that NMSU satisfied the statutory criteria for its set-aside program so long as it appeared on DoE's minority institution lists. With no reason to distrust the very agency responsible for

---

[20] Prior to 1986, the FCA barred jurisdiction over any claim "whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (1976). This was replaced in 1986 with the "original source" rule. *See* False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 3, 100 Stat. 3153, 3157 (1986) (codified at 31 U.S.C. § 3730(e)(4)(A)-(B)). *See generally United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016-17 (7th Cir. 1999) (discussing the policy choices animating the 1986 amendment).

administering the set-aside program, defendants then relied upon the DoD's assurances and invitations in certifying NMSU as a minority institution.

It is true, as relators point out, that defendants never expressly informed the DoD that NMSU did not meet, or did not have the data to determine whether it met, the criteria referenced in 10 U.S.C. § 2323(a)(1)(C). However, the undisputed evidence in the record indicates that NMSU was completely forthcoming with the DoE—the very agency on whose analysis the DoD uncritically relied. For instance, NMSU submitted data to the DoE on an annual basis. This data contained information about NMSU's student enrollment, including information concerning total institutional enrollment, total minority enrollment, and need-based financial assistance. Tellingly, there is nothing in the record to suggest that this data, or any other data submitted on behalf of NMSU, was materially inaccurate. Nor is there any evidence to suggest that NMSU deliberately withheld enrollment data in connection with its HEA applications or other submissions, such as its "higher education general information surveys." 20 U.S.C. § 1135d-5(3) (1994) (mandating that the SOE "shall verify" minority institution status from "data on enrollments in the higher education general information surveys (HEGIS) furnished by the institution"); *id.* § 1067k(3) (2000) (same).

Thus, it is undisputed that the DoE had accurate data from which to "verify" whether NMSU met the definition of a "minority institution" under 20 U.S.C. § 1135d-5(3) and, later, under 20 U.S.C. § 1067k. To the extent that this data was of

47

limited relevance, or was simply incomplete, the DoE certainly had the discretion not to place NMSU on its minority-institution lists. And the DoD had access to the DoE's lists, if not data, prior to mailing its solicitations. Collectively, then, both agencies were aware of the same universe of facts of which defendants were aware when defendants certified NMSU's minority institution eligibility.

We recognize that in most cases in which summary judgment has been granted on the basis of the government knowledge inference there has been more direct communication between the government and the contractors in the context of an existing contractual relationship—e.g., where the governmental agency, possessing full knowledge of the relevant circumstances arising from such a relationship, authorizes the contractor to make a particular representation that ultimately proves to be false.[21] Here, on the other hand, the interactions precede

---

[21] *See Becker*, 305 F.3d at 289 (granting summary judgment under the FCA because defendant's reliance upon the DoE's instructions for possibly unauthorized appropriations transfer, and upon the DoE's knowledge of Congressional authority for transfer, negated intent as a matter of law; the DoE had full knowledge of the material facts underlying the representations implicit in defendant's conduct); *Hagood v. Sonoma County Water Agency* ("*Hagood II*"), 81 F.3d 1465, 1478 (9th Cir. 1996) (granting summary judgment under the FCA in part because defendant, by submitting contractual offer to the government without a current cost reallocation, "did merely what the Corps bid it do" and because no evidence exists that defendant "caused the Corps to rely on such information as was before it to make the decisions it made" (quoting *Hagood v. Sonoma County Water Agency ("Hagood I")*, 929 F.2d 1416, 1421 (9th Cir. 1991)); *see also United States ex rel. Werner v. Fuentez Sys. Concepts, Inc.*, 319 F. Supp. 2d 682, 685 (N.D.W. Va. 2004) (granting summary judgment under the FCA because "any scienter requirement is negated by the government's knowledge and approval" where federal officials had knowledge of defendants' billing practices and still

(continued...)

48

the relevant contracts and, consequently, are not contract-specific.  However, we conclude that neither the directness of the government-contractor communications nor their nexus to an existing contractual relationship constitute an essential predicate for the government knowledge inference.   Instead, the focus properly rests upon the depth of the government's knowledge of the facts underlying the allegedly false claim and the degree to which the government invites that claim.

This conclusion is not undercut by any of the cases to which relators turn. Neither *United States v. Mackby*, 261 F.3d 821 (9th Cir. 2001), nor *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997), present situations where the government had knowledge of the facts underlying the false statements or invited the claims containing such statements.[22]  Furthermore, *Heckler*, although repeatedly stressed by relators, is distinguishable.

In *Heckler*, the Supreme Court rejected a health care provider's attempt to

---

[21](...continued)
directed defendants to bill for time not worked during events described in relator's complaint).

[22]     In *Mackby*, the Ninth Circuit held that the defendant knowingly submitted false Medicare claims for physical therapy services in part because he lacked *any* familiarity with the legal requirements for submitting such claims. *See Mackby*, 261 F.3d at 828-29.  Similarly, in *Krizek*, the District of Columbia Circuit held that a psychiatrist and his wife, both of whom submitted false Medicare/Medicaid claims, possessed the requisite scienter under the FCA because the wife "completed the submissions with little or no factual basis" and the psychiatrist "'failed utterly' to review bills submitted on his behalf."  *Krizek*, 111 F.3d at 942.  Suffice it to say, the factual scenarios of these cases are not comparable to the one here.

avoid administrative recoupment of overpayments made under the Medicare program by asserting equitable estoppel against the government. 467 U.S. at 66. The provider had obtained double reimbursement for certain costs, in violation of the applicable statutory and regulatory scheme, only after receiving oral verification of the propriety of seeking such reimbursement from the fiscal intermediary that acted as the government's contractual agent. *Id.* at 56-57.

In discussing the reasonableness of the provider's reliance, a prerequisite for an estoppel claim, the Supreme Court declared that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Id*. at 63. Applying this principle, the Supreme Court then explained that the provider did not act reasonably in relying upon the "informal" and "oral" advice of the fiscal intermediary. *Id.* at 64-65. Instead, the provider should "have obtained an interpretation of the applicable regulations" from the overseeing agency, the Department of Health and Human Services, since the provider "indisputably knew that this was a doubtful question not clearly covered by existing policy statements" and that the intermediary lacked the power to resolve policy questions. *Id.*

*Heckler* is both legally and factually distinct from the instant case. As for the legal perspective, although *Heckler* stressed in broad language that contractors may not rely upon the ultimately incorrect advice of government agents, it did so in the context of a contractor's assertion of an equitable estoppel claim against the

50

government.[23] Yet, whether the government is estopped from bringing a claim because one of its agents assured the defendant that some action was legal presents a very different question than whether reliance on government assurances can be relevant to deciding if a defendant "knowingly" presented a false claim. *Cf. Moser v. United States*, 341 U.S. 41, 47 (1951) (where petitioner's conduct would have barred him statutorily from obtaining American citizenship but he relied in significant part upon contrary written assurances issued by the government, the Court observed, "[T]here is no need to evaluate these circumstances on the basis of any estoppel of the Government . . . .  Petitioner did not knowingly and intelligently waive his rights to citizenship."). Under the FCA, the relator (or the government) must prove scienter as an element; it cannot be presumed. *See* 31 U.S.C. § 3729(b).

To be sure, it is not difficult to understand that the "the interest of the citizenry as a whole in obedience to the rule of law," *Heckler*, 467 U.S. at 60, would be significantly undermined if parties could routinely circumvent administrative recoupment efforts by asserting reliance on the bad advice of government agents. In the context of recoupment, typically the party would not

---

[23]    Indeed, this Court has construed *Heckler*'s broad language almost exclusively in the estoppel context. *See, e.g.*, *Penny v. Giuffrida*, 897 F.2d 1543, 1547 (10th Cir. 1990); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984). *But cf. Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992) (exhibiting the rare case of interpreting *Heckler* outside of the estoppel context).

51

have "suffered a detrimental change in its position" in alleged reliance on the government's assurances; "[i]ts detriment is the inability to retain money that it should never have received in the first place." *Id.* at 61, 62. However, where a statute, like the FCA, seeks to sanction and deter wrongful conduct through the imposition of up to treble damages,[24] there is little or no reason to think that allowing evidence that is highly relevant to the question of whether the conduct is in fact wrongful (i.e., knowing)—that is, evidence of the government's knowledge and cooperation—would have a comparable adverse impact on the citizenry's perception of the rule of law.[25] Indeed, the allowance of such evidence might

---

[24] *See Stevens*, 529 U.S. at 784 ("[T]he current version of the FCA imposes damages that are essentially punitive in nature . . . ."); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 734 (10th Cir. 2006) (Hartz, J., concurring) ("[T]he False Claims Act is a punitive statute . . . . The availability of treble damages, even though it has a compensatory side, also has a punitive character . . . ." (internal quotation marks and citation omitted)); *Mortgages Inc. v. U.S. Dist. Ct. for the Dist. of Nev.*, 934 F.2d 209, 213 (9th cir. 1991) ("[T]he purpose of the damages provisions of the FCA is *to deter future fraudulent claims*, as well as recoup the government's losses due to fraud." (emphasis added)); *cf. Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003) ("[I]t is important to realize that treble damages have a compensatory side, serving remedial purposes *in addition to* punitive objectives. (emphasis added)).

[25] In dissent from the subsequently-reversed panel judgment, Judge Jones rejected the application of estoppel principles where the defendants advanced government knowledge as a significant consideration bearing on whether they acted with the requisite scienter, stating:

> Even if the majority's broad estoppel rationale should apply to cases in which the government seeks money against private persons, this rationale should not apply to a civil FCA action,

(continued...)

bolster the citizenry's perception of the system's fairness. *Cf. Heckler*, 467 U.S. at

60 n.12 (recognizing that some of its precedents "seem to rest on the premise that

when the Government acts in misleading ways, it may not enforce the law if to do

so would harm a private party as a result of governmental deception").[26]

    *Heckler* also is factually distinguishable. While it may not be reasonable to

rely upon the oral advice of a governmental intermediary *without* power to resolve

the very legal question at issue, defendants in the instant appeal did no such thing.

---

[25](...continued)
> which involves the possibility of treble damages liability.
> Thus, this case is not merely one in which "the government
> seeks to recover *funds spent contrary to the will of Congress*."
> Majority Opinion at 683 (emphasis in original). Instead, the
> government in this case seeks punitive damages from private
> persons in excess of any recovery of its funds. The majority
> concede that government knowledge is relevant to and may
> defeat the defendant's "knowing" presentation of a false claim.
> It is inconsistent also to assert, as the estoppel argument does,
> that government knowledge cannot in some circumstances
> deprive the government of a civil FCA remedy.

*United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 700 (5th Cir. 2002), *rev'd en banc*, 326 F.3d 669 (5th Cir. 2003). We find these comments persuasive.

[26]    Of course, we in no way endorse the view that a government agency may authorize a government contractor, or even another agency, to deviate from statutorily-prescribed criteria. *See Stinson v. United States*, 508 U.S. 36, 45 (1993) (noting that "an agency's interpretation of its own regulations" is not entitled to controlling weight if it violates a federal statute). Nor do we reject the truism that a government contractor, like any other citizen, must know the law. *See Heckler*, 467 U.S. at 63; *Penny*, 897 F.2d at 1548. We merely hold that, in certain instances, reliance upon such authorization may be relevant to determining whether a defendant "knowingly" makes a false claim to that agency.

They were not "satisfied with the policy judgment of a mere conduit." *Heckler*, 467 U.S. at 65; *cf. Moser*, 341 U.S. at 46 (rejecting application of estoppel principles and noting that "[p]etitioner had sought information and guidance from the highest authority to which he could turn"). Nor did they accept "oral" advice. *Heckler*, 467 U.S. at 65. Rather, defendants reasonably relied upon the written assurances of the governmental agency responsible for administering the program under which NMSU sought and obtained the now-contested contracts.

In summary, this case presents a proper application of the government knowledge inference. From NMSU's enrollment data, the DoE consistently placed NMSU on its annual list of minority institutions under the HEA; and, from these lists, the DoD consistently sent NMSU solicitations for minority-institution contracts, assuring NMSU that, if it was on DoE's list, it was eligible. Not surprisingly, the defendants based their certifications upon these written assurances. Thus, the government knowledge inference generates a strong illation that defendants did not "knowingly" submit false claims within the meaning of § 3729(a) of the FCA.

### iii. Statutory and Regulatory Framework

Finally, we note that the texts of the applicable statutory and regulatory schemes help highlight the absence of scienter and confirm the reasonableness of defendants' reliance upon the DoD's confirmation of NMSU's eligibility. While relators repeatedly assert that defendants were required to know the applicable

54

legal framework, defendants' good faith belief in NMSU's eligibility is both evidenced and justified by this very framework.

As discussed above, the statutory scheme governing eligibility for the DoD set-aside program between 1994 and 2000 arguably made the SOE responsible for verifying minority institution eligibility, based upon enrollment data provided by schools to the DoE. *See* 10 U.S.C. § 2323(a)(1)(C) (1994); 20 U.S.C. § 1135d-5(3) (1994) (recodified at 20 U.S.C. § 1067k(3) (2000)). More importantly, although the DoD's regulatory scheme was unambiguous in its definition of a "minority institution," *see* 48 C.F.R. § 252.226-7000(a), it was equally unambiguous in identifying what may satisfy this definition: proof of SOE certification. *See* 48 C.F.R. § 252.226-7000(c)(2) (declaring that prior to award, offeror need only, if requested, produce evidence of SOE certification).

Because defendants' reliance upon NMSU's appearance on the DoE's lists was welcomed by the regulatory scheme, no reasonable jury could conclude on the basis of the evidence in this summary judgment record that defendants' failure to double-check the DoD's assurances of eligibility exceeded mere negligence. Defendants simply certified a position blessed by the DoD and its own regulations—although one apparently not supported by the statutory criteria. From the evidence provided, the worst that can be inferred is that defendants unwittingly took advantage of a legal paradox. *See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (finding that defendants

55

did not knowingly violate the FCA when they received payment for claims under an allegedly unenforceable contract because the law was uncertain as to whether the contract was actually unenforceable); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478-79 (9th Cir. 1996) (holding that signing a contract with an arguably false cost-allocation figure, based upon a "disputed legal issue" as to the requisite precision of this figure, does not amount to deliberate ignorance or reckless disregard); *see also Southland Mgmt. Corp.*, 326 F.3d at 682 (Jones, J, concurring) ("[W]here disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position can not result in his filing a 'knowingly' false claim.").

## 2. FCA Claims Based Upon Post-Notification Conduct

The district court also held that no defendant violated the FCA after Mr. Birx's meeting with Mr. Rogers. The district court reasoned that the only post-April 19, 2000, certification—a May 2, 2000, letter to a DoD contracting officer—was truthful.

Relators present two challenges to this analysis. First, relators argue that the district court erroneously found only one post-April 19, 2000, certification. Second, relators contend that the May 2, 2000, certification was false because it "failed to mention that NMSU did not qualify as a minority institution under the DoD's HBCU/MI set aside program and failed to refer to the correct eligibility criteria." Aplt. Br. at 58.

56

Initially, we reject relators' contention that they presented more evidence than just the May 2, 2000, certification. Although relators argue in their opening brief that there were "at least" two false certifications of minority-institution status after April 19, 2000, *see* Aplt. Br. at 57, they identify *only* two: the May 2, 2000, certification and an April 19, 2000, certification by Mr. Conroy. Moreover, the citation in their brief identifies no actual evidence of the April 19, 2000, certification, but only an allegation in their pleadings that Mr. Conroy offered such a certification. This unverified allegation fails to meet relators' burden at the summary judgment stage. *See* Fed. R. Civ. P. 56(e) (declaring that when motion for summary judgment is made and supported, an adverse party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("On summary judgment, however, the plaintiff can no longer rest on the pleadings . . . .").

As to the May 2, 2000, certification, we hold that no reasonable jury could find that it contained a false statement. This letter, arguably written on behalf of Mr. Birx,[27] accurately and honestly alerted the DoD to the possible conflict between

_____

[27] The May 2, 2000, letter was written by Ms. Pritchard, who is not a defendant in this action. Nonetheless, the district court concluded "that the letter's reference to 'we' could be interpreted to include Birx, who was at the meeting with Rogers." 400 F. Supp. 2d at 1288 n.12. The court explained that it was giving relators the benefit of the doubt, "especially in light of Defendants' failure to challenge this aspect of the letter." *Id.* We do the same.

the DoE's list and the DoD's requirements for minority-institution eligibility: "Regarding NMSU/PSL Minority Institution Certification, this is to inform you that on April 18, 2000 we were notified that there apparently are differing requirements across agencies." App. at 818. After this disclosure, the letter then certified what was known to be true: "[t]hat New Mexico State University has qualified for Minority Institution status under 48 CFR Chapter 2, Part 226.70 and 34 CFR 607.2 through 607.5 and has been placed on the Department of Education List of Title III eligible institutions for FY 1999." *Id.*

Put simply, there was nothing in the May 2, 2000, letter that was false. *See United States ex. rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x. 980, 982 (10th Cir. 2005) ("At a minimum the FCA requires proof of an objective falsehood."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations . . . are not fraud unless the violator knowingly lies to the government about them."). Mr. Birx did not represent NMSU's minority-institution status under the *statutory* criteria governing the DoD set-aside program. Instead, he certified NMSU's status pursuant to the *regulations* under which NMSU, without ambiguity, could claim minority-institution status and HEA eligibility. Even relators concede that the May 2, 2000, letter "accurately stated under what statutes and regulations NMSU did qualify as a minority institution." Aplt. Br. at 58.

Nor did the May 2, 2000, letter omit sufficient material information to be actionable. *See United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997) (recognizing that material omissions may constitute false claims under certain circumstances). Mr. Birx alerted the DoD that a DoE-eligibility designation might not satisfy the statutory requirements for the DoD set-aside program. He further admitted that NMSU just became aware of this conflict. While it might have been better to provide the fullest disclosure by quoting the statutory requirements and explaining that NMSU had not kept the relevant statistics, the absence of such information does not give rise to a false claim. The DoD was provided with enough facts to be able to reach that conclusion on its own. For that matter, Mr. Birx may still have been unsure of how to sort out the apparent conflict between the regulations and the statute, and thus uncertain whether NMSU qualified under the appropriate DoD criteria. Explicitly conditioning NMSU's minority-institution certification upon those regulations that NMSU clearly did satisfy was logical under the circumstances and did not evince the filing of a false claim.

Even if the May 2, 2000, certification was somehow false, nothing in the summary judgment record indicates it was "knowingly" so. At worst, a reasonable jury could find that Mr. Birx was negligent in pressing NMSU's eligibility shortly after his meeting with Mr. Rogers. It is more likely, however, that the May 2, 2000, letter was Mr. Birx's attempt to resolve the confusion surrounding NMSU's

59

status.  Mr. Birx alerted the DoD to a potential problem with NMSU's prior certification, admitted that NMSU had been unaware of this potential problem, and then ventured to submit only a limited but accurate certification of NMSU's minority-institution status.  No reasonable jury could find that the May 2, 2000, certification, absent other evidence of duplicitous intent, was made with the requisite scienter.  *See United States ex rel. Costner v. United States*, 317 F.3d 883, 887-88 (8th Cir. 2003) (finding no intent under the FCA, as matter of law, when a contractor communicates with the government regarding problems and engages in cooperative effort to find a solution); *Wang*, 975 F.2d at 1421 ("The fact that the government knew of [defendant's] mistakes and limitations, and that [defendant] was open with the government about them, suggests that while [defendant] might have been groping for solutions, it was not cheating the government in the effort.").

## III.  CONCLUSION

In conclusion, we **AFFIRM** the district court's grant of summary judgment in favor of defendants on relators' FCA claims.  Because defendants are entitled to summary judgment regardless of whether qualified immunity applies, we do not decide whether qualified immunity functions as a viable defense against a qui tam action under the FCA.  And, based upon this affirmance, we dismiss defendants' conditional cross-appeal as moot.