INGRAM COAL COMPANY, a corporation, Plaintiff–Appellee,

v.

MOWER LIMITED PARTNERSHIP, A West Virginia Limited Partnership, Defendant–Appellant.

No. 87–2194.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1989.

Decided Dec. 21, 1989.

Christopher Sax Smith (Eugene R. Hoyer, Hoyer, Hoyer and Smith, Charleston, W.Va., on brief), for defendant-appellant.

Steven Paul McGowan, Charleston, W.Va. (Herbert G. Underwood, Clarksburg, W.Va., Steptoe & Johnson, Charleston, W.Va., on brief), for plaintiff-appellee.

Before WIDENER, Circuit Judge, ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

WIDENER, Circuit Judge:

In June 1983 Ingram Coal Company sold certain of its assets to Mower Lumber Company and NewEra Resources Corporation (predecessors in interest to the appellant, Mower Limited Partnership). The sale included the Cheat Bridge Coal Preparation Plant in Randolph County, W.Va., and the rights to certain coal leases in the surrounding area. The transaction was memorialized by a written Asset Purchase and Sale Agreement dated June 15, 1983. In this agreement Ingram warranted that the coal cleaning plant was in good operating condition and suitable for its intended use.

Sometime subsequently, Mower contended that the plant was not in good condition on the date of sale, and that this constituted a breach of contract making Ingram liable for $91,406.15 in repairs, plus interest in the amount of $19,899.88. Mower also contended that the plant was not suitable for its intended use. In December 1985, Mower withheld $111,306.03 it owed

to Ingram under a Coal Sales Agency Agreement to apply against Mower's claim for the cost of repairs to the plant. Ingram then filed this suit based on diversity jurisdiction seeking judgment in the amount of the withheld funds. Mower filed a counterclaim seeking damages for breach of warranty of fitness for intended use and breach of warranty of good condition.

At the close of Mower's evidence on its counterclaim, the district court granted Ingram's motion for a directed verdict as to the claim of breach of express warranty that the cleaning plant would be suitable for its intended use. The remainder of the case went to the jury. The jury found that Mower owed Ingram the $111,306.03 withheld, but also found that Ingram breached its warranty that the plant would be in good condition and repair on the date of sale and awarded Mower $44,000 in damages. The court entered judgment in favor of Ingram for $66,894.72.[1] Mower appeals, claiming the district court erred in granting the directed verdict and in excluding certain evidence. We affirm.

In section 5.7 of the sales agreement, Ingram warranted that the coal cleaning plant would be in good operating order and fit for its intended use. The section reads:

*Condition of Assets.* The Preparation Plant is in good condition and repair, ordinary wear and tear, which is not as to affect adversely the operation of the Preparation Plant, excepted, and suitable for the use for which intended, but Seller makes no representation or warranty as to the capacity of the Preparation Plant. The Preparation Plant conforms in all material respects with all applicable laws, ordinance, regulations, rules, orders and other requirements relating thereto currently in effect.

The agreement, however, does not define the "use for which intended" of the plant. The agreement also provides that it shall be construed and interpreted in accordance with the laws of West Virginia and that the "Agreement, together with the annexed Exhibits constitutes the entire agreement between the parties. . . ."

Mower argues that the intended use of the plant is to clean all marketable coal mined from the surrounding properties and that on the date of sale the plant was not in conformity with this warranty because it cannot clean the fine coal mined from the surrounding properties.[2]

Ingram, on the other hand, claims that the plant is fit for its intended use, to clean and process coal that is larger than $0 \times 100$ mesh. Ingram contends that the plant flow sheet showing the design and limitations of the plant was available to Mower before the sale. This flow sheet shows, according to Ingram, that the plant was not built, nor has it ever been modified, to clean $0 \times 100$ mesh coal. Furthermore, Ingram points out that it disclaimed any representations as to the condition and grade of coal found on the surrounding property in the sales agreement. This provision reads:

*Condition of Coal.* Seller makes no representations or warranties regarding the quantity, quality or mineability of any coal contained on premises that are covered by any of the Coal Leases.

The district court rejected Mower's interpretation of the intended use provision of the agreement and granted In-

---

1. The jury found that Mower owed Ingram $111,306.03 and that Ingram owed Mower $44,000. We calculate the balance owing to Ingram as $67,306.03. The court entered judgment in the amount of $66,894.72. The only evidence in the record as to the cause of this difference is a mention by the district judge at the time of the return of the jury's verdict that each party was entitled to prejudgment interest and this would be included in calculating the final judgment award. In any event, the parties do not dispute the $66,894.72 figure.

2. Coal particles of differing sizes are delivered to the plant for cleaning. Coarser particles are classified as "1–1/2 inches by 28 mesh." A smaller size is "28 mesh by 100 mesh" which is the consistency of talcum powder. "Ultrafine" particles are "100 mesh by zero." The plant could not clean $0 \times 100$ mesh sized coal, and as a result, Mower had to send this coal to the refuse pile as waste. The testimony was that between June 1983 and 1986, twelve percent of the total clean coal product was sent to the refuse pile as a result of the plant's inability to clean $0 \times 100$ mesh coal.

gram's motion for a directed verdict on this claim. A motion for directed verdict should be granted only if, viewing the evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion. *Smithy Braedon Co. v. Hadid*, 825 F.2d 787 (4th Cir. 1987); *Walker v. Pettit Construction Co.*, 605 F.2d 128 (4th Cir.1979). Under West Virginia law it is the duty of the court, and not the jury, to interpret a written contract. *Orteza v. Monongalia County General Hospital*, 318 S.E.2d 40, 43 (W.Va.1984). While the sales agreement at issue in this case provided for an express warranty of suitability for intended use, the agreement did not spell out the intended use of the plant. Thus, the district court had to construe the warranty at issue before it could rule on Ingram's directed verdict motion.

■ The court found that the preparation plant was built without the ability to process fine coal in 1976. While modified in 1979 to process $28 \times 100$ mesh coal, the plant was never modified to process the ultrafine $0 \times 100$ mesh coal. The court further found that both Ingram and Mower were sophisticated, knowledgeable commercial parties, both of which knew the capacity and limitations of the plant.

The district court stated:

Mower's counsel asserts and has asserted throughout that it is common sense that if a coal preparation plant is built on the property, it's built for the economic reason to process coal from surrounding contiguous, adjacent or nearby properties, and the Court can accept that proposition as a general proposition, but to use that common sense proposition and to expand a general warranty of fit for intended purpose to mean the intended purpose to efficiently, economically, and properly claim all of Mower's coal, minable, and for which there is a market strains the Court's credulity.

Thus, the court ruled that, as a matter of law, the contract did not provide for the warranty which Mower asserted. The court held that the plant is "generally fit for the intended purpose of processing, cleaning, and washing, and conveying coal." Based on the uncontradicted evidence that the plant was suitable for this purpose, the court granted Ingram's directed verdict motion on the breach of warranty of suitability for intended purpose.

We believe that the district court's construction of the intended use warranty is correct. The court found, and it is not disputed by either party, that the plant has never been capable of processing $0 \times 100$ mesh coal. The court also found that both Mower and Ingram were knowledgeable, sophisticated commercial parties who were fully capable of protecting their own interest in an arm's length transaction. It would be illogical to find that the parties had intended the plant to be suitable for a use that both parties knew it could not perform.

The district court ruled that the intended use of the plant was the use for which it was built, to process, wash, clean and convey coal. Neither party contends that the plant is not suitable for this purpose. Thus, under the district court's construction of the warranty, the evidence leads to only one conclusion, the plant is suitable for its intended use. The court's ruling on the directed verdict motion, therefore, was correct.

Mower also objects to what it calls the district court's refusal to admit evidence of repairs made to the cleaning plant after October 1983. It takes the position that a list of repairs in the total amount of some $130,000.00 was ruled inadmissable by the district court. While it is true the list was not admitted into evidence, we have read that part of the record with respect to its admission and do not find a ruling of the district court with respect to the list. Indeed, there is some doubt the list was offered into evidence. A fair reading of the transcript seems to us more of an acquiescence of Mower that the objection to the admissibility of the list made by Ingram was well taken.

Even assuming, however, that most of the items on the list were items which Mower claimed needed repairing to get the plant into good operating condition, what we must assume to be essentially the same

items were admitted into evidence as a part of the claim Mower made to Ingram in a letter dated December 20, 1985.[3] An examination of the items on that December 20th list shows that none of them were dated after October 1983, and as to two of the three items on the December 20th list which were undated, evidence was introduced with particularity as to those items by invoice at the time the introduction of the list in question was not pursued. It is more than passing strange that in paragraph 8 of Mower's counterclaim for damages it claims "$91,406.15 in costs and repairs," and the amount in the itemized claim attached to the December 20th letter to Ingram we have just mentioned was also "$91,406.15." In addition to the foregoing, Mower's expert witness, Shufflebarger, testified as to an amount of $100,000.00 to place the plant in good operating condition on the date of the purchase. The jury returned its verdict in the amount of $40,-000.00 although Mower now claims that only $30,877.87 was considered by the jury.

■ Upon consideration of all of which we are of opinion there was no error with respect to the introduction or exclusion of that list, the point was not saved. And in the event that there was error, we are of opinion the same was harmless, for essentially the same evidence was introduced from other sources. This is a proper case, we think, for the application of F.R.C.P. 61 to the effect that error in the admission or exclusion of evidence should not be grounds for disturbing a judgment unless such admission or exclusion amounts to a denial of substantial justice. See also 28 U.S.C. § 2111.

The judgment of the district court is accordingly

AFFIRMED.

**3.** We ascribe the differences between the December 20th letter, the list in question, and Shufflebarger's testimony to be due to differing estimates of different experts.