PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA ex rel.
THOMAS M. UBL,

        *Plaintiff-Appellant,*

        v.

IIF DATA SOLUTIONS; CHARLES
PATTEN, SR.,

        *Defendants-Appellees,*

        and

UNITED STATES GENERAL SERVICES
ADMINISTRATION,

        *Party-in-Interest.*

        No. 09-2280

PROJECT ON GOVERNMENT
OVERSIGHT,

    *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:06-cv-00641-LO-TRJ)

Argued: January 25, 2011

Decided: April 19, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
GREGORY, Circuit Judges.

Affirmed in part; reversed in part by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Victor Aronoff Kubli, KUBLI & ASSOCIATES, PC, Vienna, Virginia, for Appellant. James Joseph Duane, REGENT UNIVERSITY SCHOOL OF LAW, Virginia Beach, Virginia, for Appellees. **ON BRIEF:** Michael S. Lieberman, Stephen Stine, DIMUROGINSBERG, PC, Alexandria, Virginia, for Appellant. Christopher I. Kachouroff, DOMINION LAW CENTER, PC, Lake Ridge, Virginia; Jason N. Workmaster, MCKENNA, LONG & ALDRIDGE, LLP, Washington, D.C.; Robert J. Cynkar, CUNEO, GILBERT & LADUCA, LLP, Alexandria, Virginia, for Appellees. Richard R. Renner, KOHN, KOHN & COLAPINTO, LLP, Washington, D.C., for Amicus Supporting Appellant.

---

**OPINION**

TRAXLER, Chief Judge:

Thomas Ubl brought an action under the False Claims Act ("FCA") against his former employer, IIF Data Solutions, Inc., and Charles Patten, Sr., IIF's vice-president (referred to together as "IIF"). Ubl and IIF reached an agreement to settle the action for almost nine million dollars, contingent on approval by the government. The government did not approve the agreement, the case eventually proceeded to trial, and the jury found in favor of IIF on all counts. The district court thereafter determined that the action was "clearly frivolous" and ordered Ubl to pay IIF approximately $500,000 in attorney's fees. *See* 31 U.S.C.A. § 3730(d)(4) (West 2003). Ubl appeals, arguing that the district court erred by not enforcing

the settlement agreement, that the district court made various errors during trial entitling him to a new trial, and that the district court erred by awarding attorney's fees to IIF. We conclude that the district court properly refused to enforce the settlement agreement and committed no reversible error during the course of trial. However, we agree with Ubl that his action was not clearly frivolous and we therefore reverse the award of attorney's fees.

I.

IIF, a small company located in Falls Church, Virginia, was founded by Charles Patton, Sr., who had served in the Army National Guard for twenty-eight years before starting the company. IIF initially worked as a subcontractor for a prime contractor that was providing information-technology services to the National Guard Bureau. IIF later sought out and was awarded its own government contracts, and those contracts are at the center of this case.

The government contracts awarded to IIF were "multiple award schedule" ("MAS") contracts. The MAS program provides a simplified process through which government agencies can obtain commercial supplies and services at prices associated with volume buying. MAS contracts are solicited, negotiated, and awarded by the General Service Administration ("GSA"). Prospective vendors must provide GSA with information about their sales practices and their pricing and discount information. GSA uses this information to negotiate prices for MAS contracts, seeking to obtain for the government the best price offered to the vendor's most favored commercial customer. *See* 48 C.F.R. § 538.270(c). The accuracy of the pricing information provided to GSA by the prospective vendors is thus critical to the MAS process.

If the negotiations between GSA and the prospective vendor are successful,

> GSA will list the firm's product, along with similar products sold by competing firms (with MAS contracts), in a catalogue. Individual government agencies may place orders for any item listed in the catalogue (at the price there listed) without the elaborate paperwork that other government procurement programs require. The GSA's MAS contract *does not commit the government* to buying the product. Rather, it provides an *option* for federal government agencies to buy at a particular price, an option that individual agencies may, or may not, exercise.

*United States v. Data Translation, Inc.*, 984 F.2d 1256, 1258 (1st Cir. 1992) (citations omitted).

GSA first awarded IIF an MAS contract authorizing IIF to provide personnel to perform information technology ("IT") services. The contract included six labor categories (*e.g.*, analyst I, analyst II, programmer, senior programmer, etc.) and the rates at which employees assigned to each category would be billed. The labor categories (or position descriptions, as one witness called them) listed the education, experience, and skill requirements necessary for the IIF employee to be assigned to each category. IIF later received MAS contracts authorizing it to provide certain environmental and business improvement services.

IIF subsequently received millions of dollars worth of task orders under the MAS contracts, with the majority of task orders coming from the National Guard Bureau (the "Bureau"). The Bureau, part of the Department of Defense, is "the channel of communications on all matters pertaining to the National Guard, the Army National Guard of the United States, and the Air National Guard of the United States between (1) the Department of the Army and Department of the Air Force, and (2) the several States." 10 U.S.C.A. § 10501 (West 2010).

According to Ubl, IIF when applying for the MAS contracts made various material false representations about its prior pricing and discounting practices. For example, Ubl alleged that IIF fabricated and back-dated a commercial price list, listed as "market-tested" hourly rates that it had never charged in any of its contracts with non-governmental customers, and misrepresented the nature of discounts it had given non-governmental customers. Ubl also alleged that IIF made false claims when submitting invoices under the individual task orders placed with IIF by the Bureau after IIF obtained the MAS contracts. According to Ubl, IIF misclassified some of its employees and billed them to the government at rates higher than warranted by the employees' education and experience, billed the government for hours not worked, and billed the government for administrative activities performed by its employees that should have been absorbed by IIF as overhead.

The allegations described above formed the core of Ubl's FCA action against IIF. We will provide more details as needed within the discussions of the issues raised by Ubl.

## II.

We first consider Ubl's claim that the district court erred by refusing to enforce the settlement agreement.

Ubl commenced this action in June 2006. After almost two years of discovery and typical pre-trial wrangling, the case was scheduled for trial on May 6, 2008. On the day trial was to begin, UBL and IIF agreed to settle the case, and they executed a document (the "May 6 Agreement") setting out the terms of the settlement. Under the May 6 Agreement, IIF was to pay $8.9 million in settlement of all claims, to be allocated between Ubl and the government according to a schedule set out in the agreement; IIF was to make an initial payment of $1.2 million, with the balance to be paid monthly over the course of ten years. The May 6 Agreement stated that "[t]his

agreement is void without Government approval. If the Government does not approve this agreement, the parties shall cooperate in good faith to effectuate changes to this Agreement that will be satisfactory to the Government." J.A. 436. The requirement that the May 6 Agreement be approved by the government tracks the requirements of the FCA itself, which provides that the government must consent to a dismissal of an FCA claim brought by a private party. *See* 31 U.S.C.A. § 3730(b)(1) (West 2003); *United States v. Purdue Pharma L.P.*, 600 F.3d 319, 328 (4th Cir. 2010) ("Section 3130(b)(1) manifests Congress' express intent to prohibit a relator's unilateral settlement of FCA claims, absent the government's consent, once a suit has been filed.").

On June 3, 2008, the government notified the parties that it had several objections to the proposed settlement. Although the May 6 Agreement called for Ubl to receive his share of the settlement proceeds first, the government contended that 31 U.S.C.A. § 3713 required the government to be paid before Ubl. The government stated that since the case had not (at that point) proceeded to trial, it would not consent to awarding Ubl 30% of the settlement proceeds, as proposed in the agreement. Noting that Ubl's complaint did not assert a retaliation claim under 31 U.S.C.A. § 3730(h) (West Supp. 2010), the government also objected to the allocation of a portion of the settlement proceeds to the settlement of what the agreement characterized as Ubl's "personal claim." Finally, the government expressed doubt that IIF could fund the $8.9 million settlement and stated its belief that "the settlement is designed to provide [Ubl] with $1.2 million and to provide the United States with an uncollectable debt." Defendant's Opposition to Relator's Motion to Enforce Settlement, Exhibit 3.

Negotiations among the parties continued after the government's letter, but with little success. In an email on July 8, 2008, the government stated that "[t]here is at this point no settlement because the United States has not consented to the current arrangement between [Ubl] and defendant and as set

forth in our prior communications, we would never consent to the arrangement as it stands now." Defendant's Opposition, Exhibit 4. In an email two days later, the government reiterated its position that it "d[id] not consent to the current proposed settlement." Defendant's Opposition, Exhibit 5. Quoting from an earlier email sent by counsel for Ubl, the government explained that "to state the 'government has not yet approved' the proposed settlement, misstates the status of the negotiations." *Id.*

An email sent the same day by counsel for IIF made it clear that IIF believed the May 6 Agreement was by then a dead letter:

> There is no "settlement agreement." Paragraph 21 of the May 6 agreement states: "This agreement is void without Government approval." In her [July 8] e-mail, [counsel for the government] stated that the Government "would never consent to the agreement as it stands now." Thus, the May 6 agreement is void. . . .
>
> Given all of this, what we are attempting right now is simply good-faith negotiation of a *new settlement agreement* that all parties can agree to . . . .

Defendant's Opposition, Exhibit 5 (emphasis added).

The parties continued their efforts to reach a settlement for many months thereafter. After a settlement conference conducted by a magistrate judge, IIF offered in January 2009 to settle Ubl's claims for $2.7 million. Ubl did not accept that offer, and on March 24, 2009, IIF reiterated its view that the May 6 Agreement was void, and IIF formally withdrew its January 2009 settlement offer. *See* J.A. 395a-c.

Ubl nonetheless continued to seek the government's approval of a settlement, and he eventually succeeded. On

September 25, 2009, Ubl filed a motion seeking to enforce the May 6 Agreement. In the motion, Ubl asserted that he and the government had

> resolved in principle between them the issues of the total Settlement Amount specified in the May 6, 2008 Agreement . . . , the allocation of the Settlement Amount between the United States, [Ubl], and [Ubl's] Counsel, and the terms specified in the May 6, 2008 Agreement with respect to the upfront payment and payout terms. Government trial attorneys are prepared to recommend to officials with authority within the United States Department of Justice and the relevant agencies approval under such terms, should the Court grant enforcement of the May 6, 2008 Agreement between [Ubl] and Defendants.

J.A. 424.

The district court denied the motion. The court noted that government approval of the settlement was required and that the government clearly rejected the May 6 Agreement. While Ubl and the government later reached an agreement, IIF had never consented to the terms of that agreement. The district court therefore concluded that the parties had never entered into a binding, enforceable agreement.

On appeal, Ubl contends that the district court erred by refusing to enforce the May 6 Agreement. Ubl argues that the May 6 Agreement was a binding contract, with performance under the contract dependent upon satisfaction of a specified condition—government approval of the settlement. The May 6 Agreement obligated the parties to work in good faith to obtain the government's approval, and Ubl argues that the government's approval of a settlement in September 2009 thus made the May 6 Agreement fully enforceable.

The enforceability of an agreement to settle claims under the FCA is governed by federal common law. *See Pinchback*

*v. Armistead Homes Corp.*, 907 F.2d 1447, 1453 (4th Cir. 1990) ("The effect of the release on Pinchback's federal claims against Armistead is a question of federal law."); *see also United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168-69 (10th Cir. 2009) (federal common law determines enforceability of release of FCA claims); *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 960-61 (9th Cir. 1995) (same). When applying federal common law to contract issues, courts generally look to the *Restatement* for guidance. *See Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that the principles of the *Restatement of Contracts* "represent the prevailing view among the states" and are the principles "from which we would be inclined to fashion a federal common-law rule" (internal quotation marks omitted)); *accord In re Peanut Crop Ins. Litig.*, 524 F.3d 458, 471 (4th Cir. 2008); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007).

We agree with Ubl that the May 6 Agreement was a binding contract, with the obligations to perform under the contract dependent upon the government's approval of the agreement. *See Restatement (Second) of Contracts* § 59, illus. 2 (1981) ("A makes a written offer to sell B a patent in exchange for B's promise to pay $10,000 if B's adviser X approves the purchase. B signs the writing in a space labelled 'Accepted:' and returns the writing to A. B has made a conditional promise and an unconditional acceptance. There is a contract, but B's duty to pay the price is conditional on X's approval.").

What Ubl fails to address or even acknowledge, however, is that the government did not approve the May 6 Agreement. As noted above, the government stated in its July 8, 2008, email that there was no settlement because the government had not approved the agreement and *would not* approve the agreement in its then-current form. Two days later, the government reiterated that it did not consent to the proposed set-

tlement. These statements must be understood as a definitive rejection of the May 6 Agreement that rendered the Agreement void under its own terms. After the rejection, the government no longer had the power to accept the May 6 Agreement, *see Restatement* § 38(1) ("An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention."), and Ubl could no longer insist on IIF's performance under the May 6 Agreement, *see id.* § 225(2) ("Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.").

While Ubl and the government did eventually reach agreement "in principle" on settlement, IIF was not a party to those negotiations and did not agree to be bound to terms reached by Ubl and the government. Moreover, by the time Ubl and the government reached their agreement, IIF had long since disavowed any interest in settling Ubl's claims.[1] The May 6 Agreement died when the government rejected it, and it was not revived by the subsequent agreement between Ubl and the government. Accordingly, the district court properly denied Ubl's motion to enforce the May 6 Agreement.

### III.

We turn now to Ubl's challenges to various issues that arose during trial.

### A.

At the beginning of trial, Ubl sought to preclude IIF from presenting evidence that the Bureau could alter the terms of the MAS contracts awarded by GSA or that the Bureau approved of the IIF personnel assigned to its contracts and

---

[1]Ubl did not argue below and does not argue on appeal that IIF breached its duty under the May 6 agreement to work in good faith to obtain the government's approval.

was satisfied with their work. The district court denied Ubl's motion, concluding that the nature of the relationship between IIF and the Bureau was relevant to Ubl's fraud claims. Ubl contends that the IIF personnel assigned to the MAS contracts were un- or under-qualified according to the labor categories set forth in those contracts and that the Bureau, as a matter of law, lacked the authority to change the terms of the MAS contract. Ubl thus argues that the Bureau's satisfaction with IIF's work is irrelevant and that the district court erred by denying his motion to exclude the evidence. We find no error.

A defendant may be held liable under the FCA for "knowingly" making or presenting a false claim, 31 U.S.C.A. § 3729(a)(1)(A) & (B) (West Supp. 2010); the statute is not intended to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (internal quotation marks omitted); *see also United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("The requisite intent is the knowing presentation of what is known to be false."). Evidence that the government knew about the facts underlying an allegedly false claim can serve to distinguish between the knowing submission of a false claim, which generally is actionable under the FCA, and the submission of a claim that turned out to be incorrect, which generally is not actionable under the FCA. That is, "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002); *accord United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2008) ("The 'government knowledge inference' helps distinguish, in FCA cases, between the submission of a false claim and the *knowing* submission of a false claim — that is, between the presence and absence of scienter."); *Hagood*, 929 F.2d at 1421 ("[T]he knowledge possessed by officials of the United States may . . . . show that the defendant did not sub-

mit its claim in deliberate ignorance or reckless disregard of the truth."). In our view, the evidence Ubl claims was improperly admitted at trial—for example, testimony from Bureau officials that they were pleased with the work performed by specific IIF employees and that they were pleased with IIF's work overall—was relevant to the issue of IIF's intent and fit sufficiently within the scope of what is generally referred to as the government-knowledge defense or inference.

Ubl, however, insists that the government-knowledge defense is unavailable to IIF, because the MAS schedule contracts were with GSA, not the Bureau, and the invoices for each individual task order awarded to IIF were sent to and paid by GSA, not the Bureau. Because the contracts were with GSA, not the Bureau, Ubl contends that the government-knowledge defense would be available only to the extent that *GSA employees* had knowledge of the facts underlying IIF's claims. We disagree.

As mentioned above, the government's knowledge of the facts underlying a claim is relevant to the question of an FCA defendant's intent. For example, if the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false. *See Becker*, 305 F.3d at 288-89. We see no reason why the government's knowledge would become irrelevant simply because the employees with the knowledge do not work for the particular agency that happens to pay the contractor's invoices. The Bureau, an agency of the federal government, was IIF's customer, and IIF worked closely with Bureau employees when performing under its various contracts. Because IIF was working so closely with the Bureau on the very contracts that are the subject of this FCA action, we believe that the Bureau's knowledge of IIF's performance under the contracts was relevant to the question of whether IIF acted with the requisite intent. *See*

*Burlbaw*, 548 F.3d at 951-54 (in case where FCA defendant's contract was with the Department of Defense, court considered knowledge held by Department of Education employees as part of its analysis of the government-knowledge inference).

Accordingly, because the evidence Ubl sought to exclude is within the scope of the government-knowledge defense and was thus relevant to the question of IIF's intent, we cannot conclude the district court's decision to admit the evidence was arbitrary or irrational. *See United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011) ("We review a trial court's rulings on the admissibility of evidence for abuse of discretion, and we will only overturn an evidentiary ruling that is arbitrary and irrational." (internal quotation marks omitted)).

Moreover, even if we were to conclude that the district court erred by admitting the evidence, we would nonetheless find the error harmless. Ubl argues that the challenged evidence encouraged the jury to reject the claims of fraud against *GSA* because *the Bureau* was satisfied with IIF's performance, which would be impermissible given that GSA issued the MAS contracts and paid all invoices submitted under the MAS contracts. Nothing in the jury instructions or verdict form, however, would have permitted the jury to reject Ubl's claims on that basis. The instructions stated that IIF was liable for any false or fraudulent claim presented "to an officer or employee of the United States government," Trial Transcript at 1269, while the verdict form asked whether IIF had knowingly made a materially false statement to "the Government" in connection with any of the three MAS schedule contracts awarded to IIF, J.A. 1650. Because the instructions and verdict form spoke in terms of "the government," without distinguishing between GSA and the Bureau, a jury following these instructions would have found IIF liable for false statements knowingly made to GSA, regardless of whether any false statements were also made to the Bureau or whether the Bureau was satisfied with IIF's performance. The instructions

thus "did not offer the jurors any means by which to give effect to the [challenged] evidence," *Romano v. Oklahoma*, 512 U.S. 1, 13 (1994), and any error in the admission of the challenged evidence therefore would have been harmless.

B.

Ubl next contends that the district court erred by excluding certain testimony of his expert witness. We find no reversible error.

At trial, Ubl tendered Neal Fox as an expert witness. Fox had held the third-ranking position at GSA for approximately three years, and his duties included oversight and management of the types of MAS contracts (IT, business improvement services, and environmental services) that IIF was awarded. One of Ubl's primary claims was that IIF provided unqualified or underqualified employees to work on task orders issued under the IT contract. Ubl intended to have Fox testify that based on his review of the resumes of IIF employees, many of the employees lacked the education and experience required by the labor categories under which they were billed, and some were not qualified for any of the labor categories that IIF was authorized to provide. The district court excluded this testimony, concluding that expert testimony was not required and that the jury was as capable as Fox of comparing the qualifications of the IIF employees to the requirements of the labor categories.

The testimony of a qualified expert is admissible if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. We review a district court's decision to admit or exclude expert evidence for abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001).

Given our deferential standard of review, we cannot say the district court abused its discretion by excluding Fox's testimony. Fox was not involved in the awarding or oversight of IIF's MAS schedule contracts, and Fox's duties at GSA did not include creating labor category requirements for MAS contracts or making determinations about whether individual employees met the requirements of a given labor category. His opinion about the qualifications of the IIF employees was based on his comparisons of their resumes to the requirements set out in the contract labor categories. The jury was just as capable of making that comparison, and the jury was perhaps in a better position to make that comparison, given that the jury, but not Fox, had heard IIF employees testify and elaborate on their education and experience. Under these circumstances, we find no abuse of discretion in the district court's exclusion of Fox's testimony as unhelpful to the jury. *Cf. United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995) (affirming exclusion of expert testimony in part because "there is no indication that the expert testimony was at all necessary in the instant case; as noted by the district court, the comparison of photographs is something that can sufficiently be done by the jury without help from an expert"); *United States v. Stevens*, 935 F.3d 1380, 1398-99 (3d Cir. 1991) (affirming exclusion of one aspect of expert's testimony as unhelpful where expert's point could easily have been drawn by the jury by reviewing the evidence at issue).[2]

---

[2]Ubl also contends that the district court erred by refusing to allow Fox to testify with regard to what Ubl characterizes as new defenses asserted by IIF for the first time during trial and which therefore had not been addressed by Fox in his report. Because Ubl did not make a proffer of Fox's anticipated testimony, the issue is not preserved for appeal. *See* Fed. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . . [i]n case the ruling is one excluding evidence, *the substance of the evidence was made known to the court* by offer or was apparent from the context within which questions were asked" (emphasis added)).

C.

Ubl next argues that the district court erred by permitting Robert Taylor to testify about his understanding of the government contracting process. Ubl contends that Taylor provided what amounted to expert testimony without being identified or qualified as an expert witness. We disagree.

Taylor owns a financial planning and tax accounting business. Taylor had many years of experience in government contracting, and as part of his business, Taylor advises small businesses on the process of obtaining MAS contracts. Taylor provided accounting services to IIF, and he also worked with IIF on its application to secure the IT MAS contract. Taylor testified generally about how the GSA contracting process worked and about his efforts to help IIF obtain the MAS contract. Because Taylor's testimony was based on his personal knowledge and understanding of the contracting system that was derived from his years of experience with government contracting, his testimony was proper lay testimony, and the district court properly rejected Ubl's objection to the testimony. *See United States v. Roe*, 606 F.3d 180, 185-86 (4th Cir. 2010) (testimony from officer with state agency in charge of issuing handgun permits and private detective and security guard certifications about the authority of those holding such permits was not expert testimony and was properly admitted as lay testimony); *see also MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990).

In his reply brief, Ubl seems to contend that Taylor's understanding of the contracting process was wrong as a matter of law and that his testimony should therefore have been excluded on that basis. Ubl, however, did not make that objection to Taylor's testimony at trial, and he argued in his initial brief to this court only that Taylor's testimony was impermissible expert testimony. Under these circumstances, we decline to consider the argument made by Ubl in his reply brief. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th

Cir. 1996) (declining to consider claim raised for the first time in reply brief).

### D.

Ubl also contends that the district court erred by restricting portions of the testimony of two of Ubl's witnesses. We find no reversible error.

The witnesses at issue were Gigi Washington and Barbara Raine, both of whom had worked for IIF for at least some portion of the time implicated by Ubl's complaint. Washington would have testified that while she was working for IIF, she reviewed the resumes of IIF employees working on the MAS contracts and concluded that many of the employees did not satisfy the education and experience requirements set out in the contracts. Washington would have testified that she became concerned that IIF was defrauding the government and that she resigned because of those concerns. This testimony was inconsistent with and more detailed than her deposition testimony. Washington was also prepared to testify that during the time Ubl worked for IIF, he expressed concern to her about IIF defrauding the government, testimony that again would have been inconsistent with her deposition testimony.

Raine, who had been involved in writing the labor categories for the MAS contracts, testified at her deposition that she could not remember if it was possible under the contracts for an employee's experience to make up for the lack of education required by the relevant labor category. But by the time of trial, Raine was prepared to provide much more specific testimony about the need to strictly meet the educational requirements of the labor categories. Raine was also prepared to testify that Kim Trimble, IIF's director of operations, who was billed by IIF as an analyst under the IT contract, performed primarily administrative functions benefitting IIF, such that Trimble should not have been billed under the con-

tract. At her deposition, however, Raine denied having knowledge of the nature of Trimble's activities.

The district court ruled that the obligation to supplement discovery responses requires a party to notify the opposing side if a witness remembers additional information after being deposed. The court concluded that Ubl failed to provide timely notice of the change in his witnesses' testimony, and the court therefore prohibited Ubl from presenting that testimony. As to Washington, the district court also gave additional reasons (such as lack of personal knowledge and hearsay) for excluding the challenged portions of her testimony.

On appeal, Ubl argues only that the district court erred by concluding that the obligation to supplement discovery responses extends to supplementing or correcting deposition testimony. *See* Fed. R. Civ. P. 26(e) (imposing a duty to supplement on a "party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission"); *id.*, advisory committee's notes to 1993 amendments ("[T]he obligation to supplement responses to formal discovery requests applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to [non-expert] deposition testimony."). Because Ubl does not challenge the alternate bases for the district court's ruling with regard to Washington, Ubl has waived his challenge to the district court's ruling precluding those portions of Washington's testimony. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010) ("[T]he failure of a party in its opening brief to challenge an alternate ground for a district court's ruling given by the district court waives that challenge." (emphasis omitted)); *accord United States v. Amedeo*, 370 F.3d 1305, 1316 (11th Cir. 2004).

As to Raine, we cannot conclude that Ubl was prejudiced by the district court's restrictions on her testimony. Raine was permitted to testify that she believed many of the labor cate-

gories required a college degree and that Patten did not believe a college degree was important. Other witnesses, including a contract specialist with GSA, testified about the need for employees assigned to the contract to meet the education and experience requirements set out in the labor categories. In addition, Washington testified about the nature of Trimble's activities, stating that she never saw Trimble perform any kind of work other than "administrative, overhead type of activities," J.A. 639, and that she never saw anything suggesting that Trimble was actually working as an analyst under the IT contract. Because Ubl was able to present through other witnesses much of the evidence that he sought to present through Raine, we believe that any error by the district court in excluding the challenged portions of Raines's testimony was harmless. *See, e.g.*, *Ingram Coal Co. v. Mower Ltd. P'ship*, 892 F.2d 363, 366 (4th Cir. 1989) (finding any error in the exclusion of evidence harmless because "essentially the same evidence was introduced from other sources").

E.

In his final trial-related challenge, Ubl contends that the district court erred by permitting IIF to present evidence that the government was aware of the lawsuit against IIF but had not cancelled any contracts or requested a return of any government funds paid to IIF. The court had previously granted Ubl's motion in limine to preclude IIF from presenting evidence or arguing to the jury that the government had elected not to intervene in Ubl's FCA action, and Ubl argues that the admission of that evidence was inconsistent with the court's ruling on the motion in limine. Again we disagree.

Preliminarily, we note that evidence of the ongoing contractual relationship between IIF and the government is simply not the same as evidence that the government declined to intervene in the FCA action. Given its limited time and resources, the government cannot intervene in every FCA action, nor can the government pursue every meritorious FCA

claim. *See United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453, 1458 (4th Cir. 1997) ("[T]he plain language of the [FCA] clearly anticipates that even after the Attorney General has diligently investigated . . . , the Government will not necessarily pursue all meritorious claims; otherwise there is little purpose to the *qui tam* provision permitting private attorneys general." (internal quotation marks omitted)). The government's decision not to intervene in an FCA action does not mean that the government believes the claims are without merit, *see United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006), and the government's decision not to intervene therefore is not relevant in an FCA action brought by a private party. The evidence about which Ubl complains, however, has nothing to do with the government's decision not to intervene in the action, and the admission of that evidence is in no way inconsistent with the exclusion of evidence related to the decision not to intervene.

While Ubl asserts that the evidence of the ongoing contractual relationship was "extraordinarily prejudicial," Brief of Appellant at 55, he does not develop the argument or offer any explanation for or analysis of his position in his initial brief. Given the absence of any substantive argument on this point, we need not consider Ubl's claim further. *See Coleman v. Community Trust Bank (In re Coleman)*, 426 F.3d 719, 729 n.8 (4th Cir. 2005) ("In its initial brief, the Bank twice alludes to this proposition, each time in a single sentence with no argument in favor of the position. Because the brief contains no argument supporting this claim, we do not consider it.").

IV.

Finally, we turn to Ubl's claim that the district court erred by awarding attorney's fees to IIF.

In cases where the government declines to intervene, the FCA authorizes an award of attorney's fees and expenses to a prevailing defendant if "the court finds that the claim of the

person bringing the action was clearly frivolous, clearly vexa-tious, or brought primarily for purposes of harassment." 31 U.S.C.A. § 3730(d)(4). The district court determined that Ubl's claims "were sufficiently baseless to warrant an award of attorneys' fees" to IIF, J.A. 1986, and the court ultimately awarded IIF fees in the amount of $501,546.[3] On appeal, Ubl contends that his action was not "clearly frivolous" and that the district court therefore erred by awarding fees to IIF. We review the district court's decision to award fees under § 3730(d)(4) for abuse of discretion. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 356 (4th Cir. 2009). "[B]ecause a district court has close and intimate knowledge of the efforts expended and the value of services rendered, the fee award must not be overturned unless it is clearly wrong." *Id.* (internal quotation marks omitted).

The FCA does not define "clearly frivolous, clearly vexa-tious, or brought primarily for purposes of harassment." Courts, often looking to cases considering fee awards under 42 U.S.C.A. § 1988 for guidance, have given somewhat vary-ing definitions of the phrase. *See United States ex rel. Raf-izadeh v. Continental Common, Inc.*, 553 F.3d 869, 875 (5th Cir. 2008) ("An action is not frivolous if existing law or a rea-sonable suggestion for its extension, modification, or reversal supports the action."); *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1006 (9th Cir. 2002) ("An action is clearly frivolous when the result is obvious or the appellant's arguments of error are wholly without merit." (internal quotation marks omitted)); *Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001) ("A claim is frivolous when, viewed objectively, it may be said to have no reasonable chance of success, and present no

---

[3]The district court concluded that IIF was not entitled to fees incurred during the period when the parties were attempting to settle the case. The court therefore limited the award to fees incurred after March 24, 2009, the date that IIF "clearly disavowed the validity of any settlement" and the point after which IIF "indicated a renewed opposition to the action and at which Ubl should have carefully reevaluated his claims." J.A. 1952.

valid argument to modify present law."); *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1058 (10th Cir. 2004) ("[T]he plaintiff's action must be meritless in the sense that it is groundless or without foundation." (internal quotation marks omitted)).

This court in *Vuyyuru* considered the circumstances under which a prevailing FCA defendant is entitled to a fee award. For purposes of resolving that appeal only, *see* 555 F.3d at 356, the *Vuyyuru* court accepted the plaintiff's definition of frivolous—whether the relator's claim, when viewed objectively, clearly had "no reasonable chance of success." *Id.* The standard applied in *Vuyyuru* is functionally identical to the standards applied in other circuits, and we believe it provides the proper framework for evaluating fee awards under § 3730(b)(4).

Accordingly, the question before us is whether Ubl's FCA claims objectively had any reasonable chance of success. We believe that question must be answered in the affirmative, and we therefore conclude that district court abused its discretion by awarding attorney's fees to IIF.

As an initial matter, we find it significant that the district court repeatedly rejected IIF's pre-trial efforts to dismiss the case—the court twice denied IIF's motions to dismiss Ubl's amended complaint and likewise denied IIF's motion for summary judgment. This fact is not necessarily dispositive, of course, because "[c]ases that are ultimately viewed as frivolous may well survive motions for summary judgment in which the evidence may be presented in sketchy fashion and credibility may not be taken into account." *Blue v. United States Dep't of the Army*, 914 F.2d 525, 535 (4th Cir. 1990) (internal quotation marks and alteration omitted). In this case, however, the evidence Ubl presented at trial was not significantly different from the evidence presented at the summary judgment stage.

IIF disagrees with this assessment, arguing that frivolousness of Ubl's claims became apparent at trial, when Ubl was exposed as a liar. The district court apparently shared IIF's view of the case. At the hearing on IIF's request for fees, the district court stated that Ubl at trial was "inherently unbelievable" and that the jury rejected his testimony as "wholly incredible." J.A. 464. The district court was in a position to determine the persuasiveness of Ubl's testimony and the effectiveness of IIF's cross-examination, and we thus defer to the district court's view that the jury found Ubl inherently unbelievable. FCA claims, however, generally are based on and proven by documentary evidence, such that problems with the plaintiff's credibility would not necessarily prevent the plaintiff from prevailing. And in our view, Ubl presented evidence that could have supported a verdict in his favor even if the jury did not find Ubl himself to be at all credible.

For example, one of Ubl's claims was that IIF staffed the MAS contracts with unqualified and underqualified employees and thus billed the employees at rates higher than they were entitled to under the contracts. Ubl presented evidence showing that IIF billed Charles Patten, Jr., the son of IIF's owner, as an "analyst II" under the IT contract, a position that required the employee to have a bachelor's degree or four years of pertinent experience. At the time of trial, however, the younger Patten was a recent high school graduate with no college degree and only five months of IT experience. Similarly, Ubl presented evidence, through the testimony of Gigi Washington, that IIF was improperly billing Kim Trimble, IIF's director of operations, as an Analyst II under the IT contract even though she did not actually perform any IT work for the Bureau. This evidence was sufficient to survive IIF's motion for summary judgment, and it remained sufficient at trial to support at least a partial verdict in favor of Ubl. And because this evidence came from IIF records and from witnesses unconnected to Ubl, problems with Ubl's personal credibility would not have prevented the jury from relying on this evidence to conclude that IIF violated the FCA.

The jury, of course, did not find for Ubl on any of his claims. From our review of the record, we think it likely that IIF convinced the jury that any mistakes it may have made were not intentional and that the jury determined that IIF lacked the *scienter* necessary to violate the FCA. Nonetheless, the jury's acceptance of IIF's trial argument over Ubl's does not mean that Ubl's action was clearly frivolous or that he had no reasonable chance of success. *Cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) ("[T]he term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case . . . ."). Because Ubl presented evidence unaffected by his personal credibility problem that was sufficient to support a verdict in his favor, we are constrained to conclude that the district court was clearly wrong when it concluded that Ubl's claims had no reasonable chance of success. *See Vuyyuru*, 555 F.3d at 356. We therefore reverse the district court's order awarding attorney's fees to IIF.

## V.

To summarize, we conclude that the district court properly refused to enforce the settlement agreement and that the court committed no reversible error during trial, and we therefore affirm the jury's verdict in favor of IIF. However, we conclude that Ubl's claims were not clearly frivolous, and we therefore reverse the district court's order awarding attorney's fees to IIF.

*AFFIRMED IN PART;*
*REVERSED IN PART*